736 A.2d 469

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. MARKO BEY, DEFENDANT–APPELLANT.

Argued October 27, 1998—Decided August 11, 1999.

236

Claudia Van Wyk, Deputy Public Defender II, and Sylvia M. Orenstein, Assistant Deputy Public Defender, argued the cause for appellant (Ivelisse Torres, Public Defender, attorney).

Alton D. Kenney, First Assistant Prosecutor, argued the cause for respondent (John A. Kaye, Monmouth County Prosecutor, attorney; Mark P. Stalford, Assistant Prosecutor, of counsel and on the brief).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Peter Verniero,* Attorney General, attorney).

The opinion of the Court was delivered by

POLLOCK, J.

Defendant, Marko Bey, appeals as of right under *Rule* 2:2–1(a)(3) from the denial of his petition for post-conviction relief from his death sentence. He contends that he received ineffective assistance of counsel at his second penalty-phase trial for the murder of Carol Peniston. Specifically, he maintains that his attorney insufficiently investigated and presented evidence to support the mitigating factors. Bey also argues that the ineffective assistance of counsel led to the denial of his right to testify and his right of allocution. Defendant raises several other claims. Among them is the assertion that under *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), he is entitled to a new guilt-phase trial on the issue whether he acted with an intent to cause serious bodily harm as opposed to with an intent to kill. We reject all of defendant's claims and affirm his death sentence.

I.

*Facts*

In 1984, a jury convicted defendant of knowingly or purposely murdering Peniston. The jury also convicted defendant of felony murder, first-degree kidnaping, second-degree aggravated assault, first-degree aggravated sexual assault, first-degree robbery, and third-degree theft. After the penalty-phase hearing, defendant was sentenced to death. This Court upheld the convictions, but reversed the death sentence. *State v. Bey,* 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey II* ).

Following a second penalty-phase hearing in 1990, a jury again sentenced defendant to death. This Court affirmed the death sentence. *State v. Bey,* 129 *N.J.* 557, 610 *A.*2d 814 (1992) (*Bey*

*III* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). Thereafter, we found that defendant's death sentence was not disproportionate. *State v. Bey,* 137 *N.J.* 334, 645 *A.*2d 685 (1994) (*Bey IV* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995).

Defendant filed a petition for post-conviction relief ("PCR"). On March 28, 1996, the PCR court, without conducting an evidentiary hearing, denied the petition. This Court remanded for an evidentiary hearing on two ineffective-assistance-of-counsel claims. After the PCR court conducted a month-long hearing, the court again denied the petition for post-conviction relief.

The facts relating to defendant's murder of Peniston are described in *Bey II, supra,* 112 *N.J.* at 131–33, 548 *A.*2d 887 (1988) and *Bey III, supra,* 129 *N.J.* at 569–76, 610 *A.*2d 814:

On April 26, 1983, around 9:20 p.m., Carol Peniston left Neptune High School, where she had attended a computer course, and drove away in her Ford Granada. Ms. Peniston, who was divorced and living alone, neither returned to her apartment nor reported to work the next day.

\* \* \*

Subsequent investigation revealed that [Ms. Peniston's] car had been involved in a one-car collision in Newark ... on April 26, 1983, approximately four hours after Ms. Peniston left Neptune High School. The defendant's fingerprints were on the rear view mirror.

At approximately 3:30 p.m. on May 3, Asbury Park police interviewed Attilio Robot, who had found Ms. Peniston's pocketbook near an old industrial building in Asbury Park. Shortly thereafter, the police discovered her body in a shed near the building. An autopsy performed the following day, May 4, disclosed that Ms. Peniston had been dead for several days. The autopsy further disclosed that she had been beaten, sexually assaulted, and strangled. From a sneaker imprint on her chest and from evidence of fractured ribs and hemorrhaging of the right lung, vertebral column, and right atrium of the heart, Dr. Stanley Becker, the Monmouth County medical examiner, concluded that Ms. Peniston's assailant had stomped on her chest. Dr. Becker determined that the ultimate cause of death, however, was ligature strangulation. Subsequent police investigation revealed that characteristics of spermatozoa found on the victim's coat were consistent with those of defendant's saliva, and that defendant's sneakers made an imprint that was similar to the impression on the victim's chest.

\* \* \*

[On May 6, defendant was arrested for receiving stolen property, Ms. Peniston's Ford Granada. After five hours in police custody, defendant confessed to the murder.]

\* \* \*

He then gave a written statement, in which he admitted that he accosted Ms. Peniston in front of her apartment building and demanded money from her. The statement continued that when he heard someone coming, he grabbed her and led her to the shed. In the ensuing events, he repeatedly struck Ms. Peniston, sexually assaulted her, and took eight dollars as well as the car keys from her pocketbook. While on his way to Newark in her car, he collided with an iron fence alongside a graveyard, and abandoned the car.

To avoid repetition, the facts relating to the 1990 penalty-phase retrial and the PCR hearing are set forth in the relevant sections of this opinion.

## II.

### Counsel's Failure to Discover and Present
### Certain Mitigating Evidence

At the 1990 penalty-phase retrial, defendant attempted to prove four mitigating factors: (1) "defendant was under the influence of extreme mental or emotional disturbance," *N.J.S.A.* 2C:11–3c(5)(a)("extreme emotional disturbance"); (2) "defendant's age at the time of the murder," *N.J.S.A.* 2C:11–3c(5)(c) ("age"); (3) "defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired as the result of mental disease or defect or intoxication," *N.J.S.A.* 2C:11–3c(5)(d) ("diminished capacity"); and (4) "[a]ny other factor which is relevant to the defendant's character or record or the circumstances of the offense," *N.J.S.A.* 2C:11–3c(5)(h) ("catch-all").

Four witnesses, including Patricia Bey (Ms. Bey), defendant's mother; Clarence Horton, defendant's uncle; Wendolyn El, defendant's aunt; and Juliet El, a family friend; testified in support of the catch-all mitigating factor. These witnesses described defen-

dant's addiction to drugs and alcohol as well as Patricia Bey's neglect and physical abuse of defendant.

The defense also presented three expert witnesses: Dr. Gary Kay, a clinical neuropsychologist; Dr. John Young, a forensic psychiatrist; and Dr. Jonathan Pincus, a neurologist. These witnesses testified that defendant suffers from a psychiatric condition caused by organic brain damage. To support the mitigating factors pertaining to extreme emotional disturbance and diminished capacity, the experts also related defendant's account of the murder, his relationship with his mother, his abuse of alcohol and drugs, and other aspects of his life. Defendant's statements to the experts were introduced to support the catch-all factor.

Two jurors found the extreme emotional disturbance factor, and six jurors found the catch-all factor. No juror found the age and diminished capacity factors. The jury unanimously concluded beyond a reasonable doubt that the aggravating factors, prior murder, *N.J.S.A.* 2C:11–3c(4)(a), and contemporaneous felony, *N.J.S.A.* 2C:11–3c(4)(g), outweighed the mitigating factors.

At the penalty-phase hearing, two counsel represented defendant: R. Diane Aifer, lead counsel, and Donald McCauley, co-counsel. Defendant now claims that he received ineffective assistance of counsel concerning the presentation of the mitigation evidence. First, defendant questions Aifer's overall lack of preparation for the penalty-phase trial. Second, defendant alleges that both counsel were ineffective because they failed to support the catch-all factor with sufficient evidence of Patricia Bey's abuse and neglect of defendant, defendant's untreated sexual deviance, and his substance abuse. According to defendant, counsel failed to interview several potential witnesses, unreasonably decided not to call other witnesses, and failed to elicit certain evidence from witnesses who did testify. Third, defendant maintains that counsel should have presented evidence to support four "nonstatutory mitigating factors": defendant's intoxication at the time of the crime, the failure to treat defendant's substance abuse, defen-

dant's remorse, and defendant's life sentence and parole ineligibility.

At the PCR evidentiary hearing, defendant introduced testimony from fifteen witnesses to support the ineffective-assistance-of-counsel claim. The witnesses included eight people whom Aifer had not interviewed in preparation for the 1990 penalty-phase retrial: Cora Patterson, defendant's father's girlfriend; Kim Alston, Patterson's daughter; James Sullivan Evans, Patterson's son; Kenneth McGloun, defendant's half-brother; Mack El, defendant's cousin; Theopolis Stewart, defendant's childhood friend; Armand Veltre, defendant's sixth-grade teacher; and John Kuttin, defendant's Little League baseball coach. Four witnesses whom counsel had interviewed but not presented at the penalty-phase trial appeared on defendant's behalf: Benjamin Bey and Karrel McGloun, defendant's younger brothers; Ri El, defendant's cousin; and Bernadine Phillips Jackson, defendant's girlfriend at the time of the murder. Additionally, Ms. Bey, Wendolyn El and Clarence Horton, who had testified at the 1990 penalty-phase trial, again testified.

Defendant also argues that Aifer should have offered as witnesses Macko McGloun, defendant's father, and Henry Bey, defendant's brother, both of whom Aifer interviewed before the 1990 penalty-phase trial. The defense, however, did not call either as a witness in the PCR evidentiary hearing.

Several of defendant's attorneys appeared at the PCR evidentiary hearing. Aifer described her preparation for the case and explained her trial strategy. McCauley; James Kinarney, co-counsel for defendant in his trial for the murder of Cheryl Alston, see State v. Bey, 112 N.J. 45, 548 A.2d 846 (1988) (Bey I); James Smith and Judith Borman, defendant's appellate attorneys; Timothy Hughes, Deputy Public Defender and Aifer's boss; Matthew Astore, co-counsel on direct appeal of the second death sentence; and Edward Washburn, co-counsel at the guilt-phase trial, also testified.

Lastly, the PCR court admitted into evidence welfare department records, notes from a probation officer, and a report by Lois Nardone, a social worker, concerning defendant's social history. Nardone interviewed thirty-five witnesses and reviewed many documents to construct a detailed compilation of defendant's life history. The court, however, did not permit Nardone to testify.

## A. *Ineffective–Assistance–of–Counsel Standard*

Fundamental to criminal justice is a defendant's constitutional right to the effective assistance of counsel. *See Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984). The test for measuring the effectiveness of counsel in the penalty-phase of a capital trial is set forth in the opinions of the Supreme Court of the United States in *Strickland, supra,* and of this Court in *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). That test, known as the "*Strickland/Fritz*" test, provides:

> To prove ineffective assistance of counsel in his penalty-phase trial, defendant must pass a two-pronged test. First, defendant must demonstrate that counsel's performance was truly deficient, with such grievous errors that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, defendant must prove that there is a reasonable probability that, but for counsel's unprofessional errors, the jury's penalty-phase deliberations would have been affected substantially.
>
> [*State v. Morton,* 155 *N.J.* 383, 431, 715 *A.*2d 228 (1998) (internal quotations and citations omitted).]

To satisfy the first prong of the *Strickland/Fritz* test, "the defendant must show that 'counsel's representation fell below an objective standard of reasonableness.... Judicial scrutiny of counsel's performance must be highly deferential' ... [and] must avoid second-guessing defense counsel's tactical decisions 'under the distorting effects of hindsight.'" *State v. Marshall,* 148 *N.J.* 89, 156–57, 690 *A.*2d 1 (1997) (*Marshall III* ) (quoting *Strickland, supra,* 466 *U.S.* at 687–89, 104 *S.Ct.* at 2064–65, 80 *L.Ed.*2d at 693–94). Merely because a trial strategy fails does not mean that counsel was ineffective. *State v. Davis,* 116 *N.J.* 341, 357, 561 *A.*2d 1082 (1989). An inadequate investigation of the law or fact,

however, dispels the presumption of competence that might otherwise arise from a strategic choice. *Ibid.*

 A defendant can satisfy the requirement of prejudice by showing that counsel's ineffective assistance substantially affected the jury's penalty-phase deliberation to a degree "sufficient to undermine confidence in the outcome." *Marshall III, supra,* 148 *N.J.* at 250, 690 *A.*2d 1 (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698). The defendant has the burden of establishing a reasonable probability that the omitted information would have substantially affected the jury's deliberations during the penalty phase. *See id.* at 250–51, 690 *A.*2d 1. Although the second prong of the *Strickland/Fritz* standard is relaxed in the context of a penalty-phase proceeding, that prong, contrary to the dissent, requires more than a showing that "a reasonable juror would have considered the material in his or her deliberative process." *Post* at 298, 736 *A.*2d at 505. Unsurprisingly, because the dissent applies the wrong standard, it reaches the wrong result.

### B. *Analysis of Ineffective–Assistance–of–Counsel Claim*

#### 1. *Aifer's Investigation*

 Defendant first argues that Aifer's overall representation was ineffective. He contends that Aifer did nothing for months after she was assigned the case and that her efforts were both cursory and untimely. In particular, defendant questions Aifer's failure to retain a social worker or investigator to construct defendant's social history. He also calls attention to her refusal to delegate any responsibility to her co-counsel, McCauley.

The State counters that Aifer sufficiently familiarized herself with the facts and the law and that she implemented a sound trial strategy. According to the State, Aifer reasonably declined to introduce cumulative evidence of defendant's life history; instead, she focused on the most important facts. Her strategy of connecting mitigation evidence through the testimony of expert witnesses

presented a unified theory that explained defendant's acts. Therefore, the introduction of a social history prepared by a mitigation specialist was unnecessary. Lastly, the State argues that further investigation and preparation would not have produced any testimony that reasonably would have affected the jury's deliberations.

In August 1988, this Court rendered decisions in defendant's trials for the murders of Cheryl Alston and Carol Peniston. *Bey I, supra; Bey II, supra.* In addition to remanding this case for a new penalty-phase trial, *Bey II, supra,* we vacated defendant's conviction and death sentence for murdering Alston, *Bey I, supra.* The Public Defender assigned Aifer to the retrial of the Alston case and the retrial of the penalty-phase of the Peniston case.

Aifer met with defendant's appellate attorneys, Smith and Borman, to discuss strategy in both cases. Smith and Borman emphasized the importance of working with defendant's mother and recommended a social worker who could assist Aifer. Over the next year, Aifer did not work on either case, except for reviewing the case files. She did not contact a social worker or any other investigator. As a result, in August 1989, the Public Defender's Office held a meeting to discuss Aifer's lack of investigation. In particular, Smith criticized Aifer's inaction. Despite the meeting, Aifer continued her representation of defendant in both cases.

Shortly thereafter, Aifer began preparing for the Alston retrial. After defendant was again convicted for murdering Alston, Aifer concentrated on the Peniston case. In particular, Aifer unsuccessfully moved to preclude the use of the Alston murder conviction as an aggravating factor in the Peniston case. Because she needed additional time to prepare the case, Aifer moved to stay the Peniston trial. On June 4, 1990, the trial court denied the motion and set August 20, 1990 as the date to commence the penalty-phase hearing.

Aifer immediately began focusing on the presentation of the mitigation evidence. On June 21, 1990, Aifer, according to her

PCR testimony, began a "compressed, hard-working effort" to prepare the case. Aifer conducted in-person interviews of seven potential witnesses and telephone interviews with three other potential witnesses. Ms. Bey, defendant's most important witness, testified at the PCR hearing that Aifer met with her only once, in a meeting that lasted approximately one hour. Aifer also arranged for three medical experts, Kay, Young, and Pincus, to evaluate defendant. She hired a jury consultant to assist her on the *voir dire*. Instead of retaining an investigator or social worker, Aifer interviewed witnesses herself. She also felt that a mitigation specialist would "not necessarily" garner any additional evidence. Aifer conceded that she did not involve her co-counsel in the investigation or witness preparation.

In 1994, just before the start of another capital trial, Aifer resigned from the Public Defender's Office. Aifer believed that her superior, Assistant Public Defender Dale Jones, was unduly interfering with her case. The following morning, she submitted her letter of resignation:

> Please accept my letter of resignation, effective immediately, from all of my duties as an employee of the Office of Public Defender. After much reflection, and after discussing the matter with Dale Jones, I have come to the conclusion that I am not competent to handle the responsibilities of being an attorney within the Office. In particular, I am convinced of my inability, as corroborated by Mr. Jones, to properly represent our clients in capital cases. As you may already know, my inadequate performance resulted in a death sentence being imposed upon Mr. Marko Bey. It is intolerable to me that I may yet jeopardize the life of another young man, Mr. David Cooper, currently on trial in Monmouth County. I regret that I cannot give more notice, however, the situation is urgent. I simply cannot continue in any capacity as a member of the staff.

At the PCR hearing, Aifer explained that this letter was intended as a "sarcastic" and "facetious" response to internal criticism.

Our review of these facts leads us to conclude that Aifer's preparation was incomplete. The preparation of mitigation evidence is a substantial undertaking. To postpone preparation until two months before a penalty-phase hearing is not commensurate with the dreadful consequences of such a hearing. *See Davis, supra,* 116 *N.J.* at 353, 561 *A.*2d 1082. As Aifer's motion for a stay reflects, she should have started earlier.

Despite the incompleteness of Aifer's investigation, we decline to find that her conduct constitutes ineffective assistance of counsel. Absent specific prejudicial errors, a general insufficiency in counsel's performance does not justify vacating a death sentence on post-conviction relief. "The case law makes clear that such purely speculative deficiencies in representation are insufficient to justify reversal." *Fritz, supra,* 105 *N.J.* at 44, 519 *A.*2d 336. Only after evaluating the specific claims asserted at the PCR hearing may we determine whether counsel's failure to introduce mitigating evidence prejudiced defendant.

Although the lack of sufficient time to prepare for trial can support an ineffective-assistance-of-counsel claim, a defendant generally may support that claim with proof of specific evidence adduced at a post-conviction hearing, but not at the original trial. *See Glenn v. Tate,* 71 *F.*3d 1204, 1207 (6th Cir.1995) (finding prejudice in sentencing proceedings where counsel failed to present pertinent evidence of mental history and mental capacity discovered at post-sentencing hearing); *Blanco v. Singletary,* 943 *F.*2d 1477, 1501–02 (11th Cir.1991) (holding that defendant was prejudiced at sentencing phase by counsel's failure to discover and present any available mitigating evidence concerning defendant's impoverished childhood, epileptic seizures, and organic brain damage); *State v. Tokman,* 564 *So.*2d 1339, 1345 (Miss.1990) (affirming lower court's conclusion that evidence of defendant's psychological traits presented at post-conviction hearing could have affected judgment at trial).

The presumption of prejudice is reserved for cases involving the complete denial of the right to counsel. *Fritz, supra,* 105 *N.J.* at 53, 519 *A.*2d 336. Here, Aifer's performance does not sink to the level of the constructive denial of the right to counsel. From her prior representation of defendant in the retrial of the Alston murder, Aifer was familiar with defendant and his history. She had the benefit of the records in the original Peniston trial and the Alston trial. Additionally, Aifer interviewed many witnesses and arranged for three mental health experts to testify.

In sum, we decline to find that Aifer's preparation and investigation support the conclusion that her assistance of counsel was presumptively ineffective. The deficiencies in her preparation, however, point to the need for the Public Defender's Office to supervise more closely attorneys engaged in capital murder trials. We now turn to the question whether there were any specific deficiencies by counsel that prejudiced defendant at the penalty-phase proceeding.

### 2. *Mitigating Factors*

Defendant asserts that Aifer was ineffective in her presentation of evidence to support the catch-all mitigating factor. Specifically, he asserts that Aifer failed to present adequate evidence of his mother's abuse and neglect, his untreated sexual deviance, and his addiction to alcohol and drugs. Defendant maintains that Aifer also should have informed the jury more clearly of the components of the catch-all factor.

#### a. *Abuse and Neglect*

To support the catch-all factor, defense counsel presented extensive evidence at the 1990 penalty-phase retrial of Patricia Bey's abuse and neglect of defendant. Ms. Bey told the jury that she was an alcoholic and that she had abused alcohol during her pregnancy with defendant. She admitted to neglecting and abusing her children generally and to beating defendant on many occasions. As we related in affirming defendant's death sentence:

> Ms. Bey testified that on one occasion she knocked defendant down, causing defendant to hit his head on a coffee table and lose consciousness. Although defendant's head was gashed, she did not take him to a doctor. Ms. Bey also recalled another time when her neighbors had threatened to call the police if she did not stop beating defendant.
>
> [*Bey III, supra,* 129 *N.J.* at 573, 610 *A.*2d 814.]

Ms. Bey acknowledged that she always blamed defendant when things went wrong and that she scolded and hit him more than the other children. Her apartment was dirty, dark, and cold. Out of

fear, she covered the windows and mirrors and did not turn on the lights.

Six other witnesses confirmed Ms. Bey's testimony. Wendolyn El, Juliet El, and Clarence Horton described Patricia Bey's alcoholism and her physical abuse of defendant. Defendant's three mental health experts communicated to the jury defendant's own account of his childhood. They confirmed that Ms. Bey abused all her children, but that she meted out the harshest treatment to defendant:

> She kept the lights off in the apartment, and covered the windows and mirrors out of an alcohol-induced paranoia that the devil would get her. Several witnesses described the cold, dark, slovenly state of the Beys' apartments and the unkempt condition of the children. . . . Growing up, defendant frequently received severe, unpredictable beatings with broom handles, belts, belt buckles, straps and other items.

> [*Id.* at 572, 610 *A*.2d 814.]

Wendolyn El explained that a neighbor of the Bey family told her that Ms. Bey "beat Marko all the time." Once, when El visited the Bey apartment, Ms. Bey had beaten defendant so badly that he fled from the apartment and ran down the street.

> El surmised that Ms. Bey had singled out defendant for these brutal beatings because his father had spurned her. She also ascribed defendant's crimes to defendant's anger against his mother: "mentally Marko did not kill those two women, it was his mother that he was killing."

> [*Id.* at 573, 610 *A*.2d 814.]

El also stated that Ms. Bey's alcoholism was so severe that she experienced blackouts and was hospitalized on several occasions.

Horton revealed that defendant once told him: "I need to get out of here" and asked to live with him in Vermont. According to Horton, defendant and his brothers did not have food, water, or clothing. Defendant was forced to care for his brothers, and would find food for them to eat.

Juliet El saw Ms. Bey hit defendant. On one occasion, El saw Ms. Bey beat defendant so severely that defendant was left shaking and crying.

Despite this testimony, defendant claims that counsel was deficient in demonstrating his mother's abuse and neglect. Defendant argues that Aifer should have introduced the testimony that was elicited at the PCR evidentiary hearing.

At the PCR evidentiary hearing, fifteen witnesses testified concerning Ms. Bey's abuse and neglect of defendant. Three penalty-phase witnesses—Ms. Bey, Wendolyn El and Clarence Horton—testified again at the PCR evidentiary hearing. El's and Horton's accounts generally repeated their penalty-phase testimony. The PCR court did not allow Horton to testify about Ms. Bey's childhood in Alabama. Bey's mother, however, described her physical abuse and neglect of defendant in greater detail than she had previously.

Ms. Bey explained that she physically abused her children and frequently beat defendant so severely that he bore bruises and welts. She recalled several of the specific incidents of her physical abuse of defendant that other witnesses had described during the 1990 penalty-phase trial.

Ms. Bey stated that, when defendant was a child, she drank up to a quart of gin per day. She did not provide the children with food and rarely knew their whereabouts. Defendant was forced to take responsibility for his neglected siblings. In sum, she described her children's living conditions as "hell."

For the first time, Ms. Bey testified that during defendant's childhood she had been hospitalized many times for conditions related to her alcoholism. She had been treated for pneumonia, a heart problem, blackouts, and seizures that required her to wear a straightjacket.

In addition to Ms. Bey's testimony, the defense presented four witnesses whom Aifer had interviewed but chose not to present at the penalty-phase trial. These four witnesses, Benjamin Bey, Ri El, Karrel McGloun, and Bernadine Phillips Jackson, corroborated Ms. Bey's account of her alcoholism and frequent physical abuse of defendant. They emphasized that Ms. Bey often blamed defen-

dant for things he had not done and beat him more than her other children. According to these witnesses, Ms. Bey was an unfit parent who did not keep her home clean or feed her children. Defendant acted as a substitute parent; he made sure that his younger brothers stayed in school and had food and clean clothes.

Lastly, several witnesses whom Aifer did not interview before the penalty-phase trial testified at the PCR hearing. These witnesses included Cora Patterson, Kim Alston, James Sullivan Evans, Kenneth McGloun, Mack El, Theopolis Stewart, Armand Veltre, and John Kuttin. Patterson, Alston, and Evans focused on defendant's relationship with his father. They stated that defendant's father did not provide him with any emotional or financial support. Defendant's father openly disputed his paternity of defendant. Patterson recalled that defendant's father told her to let defendant "live on the street." According to the witnesses, defendant was an angry and frustrated teenager whom Ms. Bey often beat. Stewart and Veltre described defendant's inappropriate dress and body odor. Kuttin testified that he provided the only means of transportation to defendant's Little League baseball games. Because defendant had to go home and take care of his brothers, he could not socialize with the rest of the team.

At the PCR hearing, Aifer explained why she did not offer several of these witnesses at the penalty-phase trial. She did not call Benjamin Bey or Karell McGloun because they downplayed the extent of their mother's alcoholism and abusive behavior. Likewise, Henry Bey insisted that defendant's mother did not abuse alcohol while defendant was living with her. Aifer did not present Ri El as a witness because El was emotionally fragile and would not withstand cross-examination. Similarly, Aifer did not call Jackson as a witness because the prosecution would have cross-examined Jackson about defendant's violent sexual attack of her. Jackson previously had given the Prosecutor's Office a statement concerning defendant's attempt to rape her. Lastly, Macko McGloun did not testify because Aifer could not locate him immediately prior to the trial. Aifer stated that, even if he had

been available, she would not have had him testify because he denied paternity of defendant and denied having failed to support him.

The PCR court concluded that Aifer effectively presented evidence of Ms. Bey's abuse and neglect of defendant. The court endorsed Aifer's strategic decisions and determined that the testimony elicited at PCR was cumulative. Our evaluation of the PCR testimony likewise leads us to the conclusion that Aifer was not ineffective in the presentation of evidence of abuse and neglect that supported the catch-all factor.

Aifer was not deficient in eliciting testimony from Wendolyn El, Juliet El, and Clarence Horton. Juliet El did not present any additional testimony at the PCR evidentiary hearing, and Wendolyn El's and Horton's PCR testimony repeated their penalty-phase testimony. The PCR court properly ruled that Horton's proffered testimony concerning Ms. Bey's upbringing was irrelevant.

We question, however, the sufficiency of a solitary interview with Ms. Bey. Based on that interview, Aifer concluded that Ms. Bey would not be forthcoming in her testimony. Thus, Aifer decided to call other witnesses to corroborate Ms. Bey's account of her abuse and neglect of defendant.

Additional meetings between Aifer and Ms. Bey may have induced Ms. Bey to be more forthcoming about the details of her behavior. Ms. Bey testified at the PCR hearing that she was reluctant to provide the full details of her relationship with defendant at the penalty-phase trial because "I was frightened. I didn't want anybody to know Marko's mother was a drunk and an abusive mother." Other meetings may have helped Ms. Bey overcome her fear. Indeed, Lois Nardone, a social worker, met with Ms. Bey more than ten times over the course of one year. Ms. Bey testified that she was not willing to tell Nardone everything at first. After talking with her on several occasions, however, "it all came out."

The possible results of additional conversations with Ms. Bey are uncertain. She indicated at the PCR hearing that she had testified truthfully at the penalty-phase trial and that she was doing her best to cooperate with the defense. In fact, she articulated her testimony at the PCR hearing more fully than at the penalty-phase trial because, as she explained, "I have more ability now to open myself. I can speak more clearly now than I have spoken in five, six years." Ms. Bey's reluctance to detail her behavior may have had more to with her physical and mental condition at the time of the penalty-phase proceeding than with her lack of familiarity with defendant's attorneys.

Even if Ms. Bey had testified more fully at the penalty-phase trial, her testimony would not have affected the jury's deliberations. The additional testimony was largely cumulative of evidence revealed by other penalty-phase witnesses. Although the jury might have weighed more heavily Ms. Bey's own account of her conduct, much of the other witnesses' testimony included descriptions of her conduct that they had witnessed personally. The only new testimony Ms. Bey provided at the PCR hearing concerned her hospitalizations for treatment resulting from her use of alcohol. Through the testimony of other witnesses, however, the jury was painfully aware of Ms. Bey's alcoholism.

We also find that Aifer was deficient for failing to call Benjamin Bey, Ri El, Karrel McGloun and, Bernadine Jackson to testify. Aifer's lack of investigation and preparation leads us to disregard the presumption of reasonableness that generally attaches to a defense counsel's decisions concerning the calling of. *See supra* at 250, 736 *A.*2d at 477. For example, Karrell McGloun testified that Aifer met with him for only fifteen minutes. Similarly, Aifer never met with Ri El and based her evaluation of the witness on mere reputation. Accepting their testimony at the PCR hearing, Aifer was deficient for not presenting these four witnesses at the penalty-phase trial.

We agree with the PCR court, however, that this evidence was cumulative. The penalty-phase jury heard overwhelming evidence

of Ms. Bey's alcoholism and her abuse of defendant. Ms. Bey, in testimony that El confirmed, admitted that she singled out defendant for the most frequent beatings. From Horton, the jury knew that defendant and his brothers regularly did not have food or clean clothing and that defendant took care of his brothers. Therefore, the four witnesses' testimony merely would have reinforced the penalty-phase testimony.

Similarly, Aifer should have interviewed the eight witnesses whom she did not interview before the trial, but whom defendant has identified as providing material testimony. The testimony of those witnesses, however, merely would have been cumulative of the testimony of the other witnesses. For example, the explanation of Macko McGloun's emotional and financial neglect of defendant pales in comparison to that of the physical abuse and neglect defendant suffered from his mother. We conclude that the testimony of the witnesses whom Aifer did not interview could not have altered the penalty-phase jury's deliberations.

Lastly, defendant has not met his burden of proving that testimony from Macko McGloun or Henry Bey, who did not testify at the PCR hearing, could have affected the jury's deliberations. Defendant's claim is mere speculation.

Thus, we conclude that defendant did not receive ineffective assistance of counsel with regard to the presentation of the evidence of abuse and neglect.

### b. *Untreated Sexual Deviance*

At the 1990 penalty-phase trial, defense counsel did not present any evidence that defendant suffered from an untreated sexual deviance. Defendant contends that counsel should have informed the jury of defendant's prior inappropriate sexual behavior, together with the absence of treatment for that behavior. Such information, according to defendant, could have helped explain defendant's later criminal conduct and thereby supported a finding of the catch-all mitigating factor.

At the PCR hearing, Jackson and Wendolyn El testified about defendant's sexual conduct. Jackson described defendant's attempt to sexually assault her two days before he was arrested for the Peniston murder. Defendant tied her to her bed with her stockings and lay on top of her. After she screamed, defendant freed her. When defendant later apologized, Jackson forgave him. She thought that defendant appeared to have been in an alcohol-induced trance at the time of the incident.

El discussed three incidents in which defendant engaged in inappropriate sexual conduct. When defendant was ten years old, he fondled his four-year-old cousin's vagina. At sixteen, he attempted to molest El's neighbor, a senior citizen. Defendant once tried to touch his older cousin's genitals. Defendant never received treatment for any sexual disorder. No evidence of a disorder or failure to obtain treatment, however, was introduced.

Aifer testified at the PCR hearing that she did not introduce evidence relating to defendant's sexual deviance. She explained that the information would have alienated the jury and provided it with an additional reason to give defendant a death sentence.

The PCR court concluded that Aifer made a reasonable tactical decision by refusing to introduce evidence of prior sexual misconduct. It found that Jackson's and El's testimony would have inflamed the jury rather than persuaded it to spare Bey's life. We agree.

Aifer was fully aware of Jackson's and El's potential testimony concerning defendant's sexual conduct. Both Aifer's investigation and trial strategy were sufficient.

Although the evidence of prior sexual crimes does not directly support a statutory aggravating factor, it had the propensity to demonize defendant in the eyes of the jury. Acts of sexual deviance, moreover, do not constitute strong evidence to support the catch-all mitigating factor. No evidence at the penalty-phase trial or during the PCR hearing demonstrated that defendant's sexual misconduct was caused by a psychological disorder. For

example, after Jackson shouted at defendant, he stopped, suggesting that he was able to control his aggression. His subsequent apology also indicates that, despite any disorder, he understood that his behavior was wrong.

Defendant argues that Aifer's overall trial strategy was to introduce ample evidence to explain defendant's antisocial behavior. Thus, defendant claims that offering evidence of his sexual offenses have supplemented that strategy. The jury was told of defendant's entire juvenile record and of his attempts to rob or sexually assault three other women. Finally, the jury was informed of his conviction for the Alston murder. According to defendant, the jury could not have been further inflamed by evidence of the sexual assault on Jackson.

The jury, however, might have been offended by hearing from Jackson of defendant's sexual assault on her, as opposed to hearing of the assault as filtered through the testimony of the expert witnesses. Moreover, Jackson's testimony of defendant's attack, which occurred close in time to the murders, could have undermined defendant's contention that he acted out of control as a result of a mental condition. We conclude that Aifer was not ineffective for failing to introduce evidence of untreated sexual misconduct.

c. *Evidence of Defendant's Drug and Alcohol Abuse*

In support of the catch-all mitigating factor, six witnesses testified at the 1990 penalty phase retrial about defendant's abuse of alcohol and drugs. Ms. Bey, Wendolyn El and Horton explained that defendant had abused alcohol since the age of ten years old. Ms. Bey and Ms. El recalled defendant's hospitalization after being found on the side of the road unconscious as a result of a drug and alcohol overdose.

Additionally, defendant's experts told the jury that defendant had abused alcohol and drugs throughout his life. According to Dr. Young, defendant began drinking alcohol at age nine, and later used both marijuana and cocaine. Dr. Young stated that defen-

dant told him that he had been heavily under the influence of drugs or alcohol during both the Alston and Peniston murders. Dr. Pincus testified that defendant was constantly under the influence of alcohol and drugs. As a result, defendant experienced substance-induced blackouts. Defendant's alcohol and drug use also exacerbated his inability to control his aggression. Dr. Kay testified that defendant's left frontal lobe damage could have been caused by, among other factors, defendant's "pre-adolescent drug use." Thus, alcohol and drug use could have contributed to defendant's extreme violence.

Defendant argues that Aifer was ineffective because she failed to introduce testimony from several other witnesses who would have documented his alcohol and drug abuse. At the PCR evidentiary hearing, six more witnesses supported the evidence of defendant's drug and alcohol addiction. Jackson testified that in the weeks preceding defendant's murders, she and defendant often got drunk together. Stewart observed defendant use alcohol, marijuana, and cocaine. According to Mack El, defendant consistently was intoxicated a few months before the crimes. About three years earlier, Evans and Kim Alston saw defendant intoxicated on a daily basis. Kenneth McGloun stated that he suspected that defendant abused alcohol.

The PCR court concluded that because Jackson would have described defendant's attempted rape, Aifer reasonably decided not to call Jackson. The court nonetheless determined that Aifer was deficient for failing to call the other five witnesses who would have testified about defendant's substance abuse. The testimony of those witnesses, however, would have been cumulative of the penalty-phase evidence. Furthermore, Evans and Alston would have provided harmful evidence that defendant had been affiliated with a gang when he was a teenager. We agree.

Aifer's failure to interview Jackson and the other five witnesses cannot be attributed to a reasonable strategic decision or tactical allocation of resources. Those witnesses could have offered useful testimony concerning defendant's lifelong alcohol and drug addic-

tion, which the jury could have found was a mitigating factor. In failing to interview the witnesses, Aifer's assistance was deficient.

Their additional testimony, however, would not have affected substantially the penalty-phase deliberations. The jury heard sufficient documentation of defendant's substance abuse, including the incident in which defendant was unconscious on the side of the road. Although the PCR witnesses would have supported defendant's use of alcohol and drugs shortly before the Peniston murder, evidence of defendant's addictions was essentially uncontroverted. Defendant's penalty-phase witnesses testified that substance abuse plagued him throughout his life. One expert witness even stated that defendant told him that he had been intoxicated at the time of the Peniston murder. The State did not present any evidence suggesting that defendant had overcome his addictions during his teenage years. Evidence that Aifer might have developed would have been cumulative. Therefore, Aifer's presentation on this issue was not ineffective.

### d. *Failure to Enumerate Catch–All Mitigating Factors*

Defendant argues that Aifer also was ineffective because she did not enumerate in her penalty-phase summation each potential catch-all mitigating factor. In *Bey III*, we determined that the trial court's instructions on the catch-all mitigating factor were inadequate because they could not relate them to the evidence. 129 *N.J.* at 615, 610 *A.*2d 814. This error, however, was partially remedied by counsel's own explanation of the mitigating factors in her summation. *Ibid.* We stated that "defense counsel made it clear to the jury that all the evidence presented at trial about defendant's background could be viewed as part of the catch-all mitigating factor c(5)(h)." *Id.* at 615–16, 610 *A.*2d 814. By informing the jury of the evidence it could use to find the catch-all mitigating factor, Aifer insured that the jury would consider each potential catch-all factor. Thus, defendant did not receive ineffective assistance of counsel concerning the catch-all factor.

3. *Failure to Present Evidence to Support "Nonstatutory" Mitigating Factors*

Defendant additionally argues that Aifer should have presented evidence to support the four "nonstatutory" mitigating factors that she believed the jury should find: defendant's intoxication during the commission of the murder; the lack of treatment defendant received for his various problems; defendant's remorse; and the availability of a life sentence as an alternative to a death sentence. Two of these factors, defendant's intoxication at the time of the offense and his untreated substance abuse, overlap his argument that his history of alcohol and drug addiction supports the catch-all factor, *see supra* at 264–66, 736 *A*.2d at 485–86. Defendant's proposed "nonstatutory" factors are better articulated as additional factors from which the jury could have found the catch-all factor. Following the structure of defendant's brief, however, we shall address these four factors separately.

a. *Intoxication During Crime*

Defendant claims that Aifer was ineffective because she did not provide evidentiary support for the contention that defendant's intoxication on the night of the murder was a mitigating factor. In her opening and closing statements, Aifer referred to defendant's intoxication that night as a mitigating factor. She introduced supporting evidence through the three mental health experts, who testified that defendant told them that he was intoxicated during the commission of the crime.

Aifer chose not to introduce defendant's 1984 guilt-phase testimony that he had consumed large amounts of alcohol and marijuana on the night of the murder. She also did not use relevant interview notes taken by defense investigator George Newman in 1984. These notes indicated that defendant had told Newman that he had been under the influence of drugs and alcohol when he murdered Peniston.

At the PCR hearing, Aifer testified that she had not introduced defendant's 1984 testimony because it was not persuasive and had

been undermined by an effective cross-examination. During the cross-examination at the 1984 trial, the State had demonstrated that defendant recalled several details of the events despite his alleged intoxication. Because no one could corroborate defendant's testimony, defendant's own credibility was crucial to substantiating this argument.

Aifer's strategic decision to introduce through experts the evidence of defendant's intoxication was at least reasonable. After hearing defendant's testimony, the 1984 jury rejected intoxication as a defense to guilt and as a mitigating factor. Defendant had been cross-examined effectively on this issue during that trial. The experts, who lent credibility to defendant's story by integrating it into their testimony, conveyed the same information without permitting the State to discredit defendant's claim.

### b. *Failure to Treat Defendant's Substance Abuse*

Aifer argued in summation that the jury should consider the failure to treat defendant's alcohol and drug abuse as a mitigating factor. Defendant now contends that Aifer was ineffective because she did not introduce any specific evidence to support this mitigating factor. Specifically, defendant claims that Aifer should have introduced various documents indicating that defendant had told authorities about his alcohol and drug problem. The documents, however, would have been cumulative. At the penalty-phase retrial, Ms. Bey testified that the she knew about defendant's addiction to alcohol and drugs, but did not seek help for him. As explained previously, substantial testimony supported defendant's claim of alcohol and drug abuse. Neither the State nor any witness suggested that defendant had received any type of treatment for his addiction. The record does not establish that Aifer's representation of defendant on this issue was ineffective.

### c. *Evidence of Remorse*

Defendant also argues that Aifer was ineffective because she did not introduce any evidence of his remorse. This issue overlaps

defendant's contention that the trial court and his counsel deprived him of his right of allocution. Because this issue is best analyzed within the framework of the common-law right of allocution, we will discuss it in section IIIB, *infra* at 275–83, 736 *A.*2d at 491–96.

### d. *Life Sentence*

In her opening and closing statements, Aifer asked the jury to consider defendant's seventy years of parole ineligibility as a mitigating factor. Defendant argues that Aifer's argument was deficient because he actually would have been subject to an eighty-one-and-one-half year period of parole ineligibility.

Regardless of which period of time is accurate, Aifer's assistance was not ineffective. Any error is irrelevant because a defendant's parole ineligibility cannot be a mitigating factor. *State v. Cooper,* 151 *N.J.* 326, 404–05, 700 *A.*2d 306 (1997). Even if defendant's period of parole ineligibility were relevant, we agree with the PCR court that the ten-year difference had no propensity to affect the jury's deliberations.

### III.

*Attorney's Ineffective Assistance of Counsel Denied Defendant*
*His Right to Testify and Right of Allocution*

### A. *Right to Testify*

Defendant did not testify in 1990 at the retrial of the penalty phase. He argues that Aifer deprived him of his right to testify by unilaterally deciding that he should not do so. According to the State defendant knowingly and voluntarily waived his right to testify.

Criminal defendants have a constitutional right to testify on their own behalf. *State v. Savage,* 120 *N.J.* 594, 626–28, 577 *A.*2d 455 (1990). The decision whether to testify rests with the defendant. *Id.* at 631, 577 *A.*2d 455. Defense counsel must

inform defendants of their right to testify. Counsel may not merely rely on their own trial strategy. As we have written:

[I]t is the responsibility of a defendant's counsel, not the trial court, to advise defendant on whether to testify and to explain the tactical advantages or disadvantages of doing so or not doing so. Counsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it. . . . Indeed, counsel's failure to do so will give rise to a claim of ineffectiveness of counsel.

[Id. at 630–31, 577 A.2d 455 (internal citation omitted) ].

At the PCR hearing, Smith, defendant's appellate attorney, stated that Aifer admitted that she, rather than defendant, unilaterally decided that defendant should not testify. Aifer, however, testified that on several occasions she had discussed the issue with defendant, but that he was reluctant .to testify. According to Aifer, she explained to defendant the risk of testifying, particularly the danger of subjecting himself to cross-examination.

The dangers were real. At the Peniston trial in 1984, the prosecutor effectively cross-examined defendant. Consequently, Aifer advised defendant that it would be more convincing to present the facts about which he sought to testify through expert witnesses.

Defendant's recollection differs from Aifer's. At the PCR hearing, defendant stated that he had told Aifer that he wanted to testify at the penalty-phase hearing. According to defendant, Aifer told him that he should not testify. Instead, she suggested that defendant undergo a videotaped hypnosis as a means of presenting his testimony without subjecting himself to cross-examination. Although defendant believed that he could not be hypnotized, he agreed. The attempt at hypnosis failed. Defendant and Aifer disagreed whether defendant should testify. Although Aifer promised Bey to discuss the issue with him on a later date, they never did. As a result, defendant claims that he was unaware of his right to testify.

The PCR court concluded that Aifer had not usurped defendant's right to testify. The court determined that defendant was aware of that right as a result of his original murder trials in 1983

and 1984. According to the court, defendant chose not to exercise this right in 1990. Instead, he concurred with counsel's decision to shield him from cross-examination.

From the foregoing, we conclude that Aifer did not inform defendant properly that the decision whether to testify was his. Nor did she sufficiently consult with defendant. Instead, Aifer decided on her own that defendant should not testify at the penalty-phase retrial.

■ The next question is whether counsel's deficiency prejudiced defendant. Defendant argues that we should forego this analysis because of the fundamental nature of the right to testify. He posits that the impact of a defendant's own words on a jury is too speculative to support a finding of harmless error. Consequently, defendant urges the adoption of a *per se* rule that the denial of the right to testify is presumptively prejudicial. Alternatively, defendant requests that we require the State to prove that the denial of the right to testify was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 *U.S.* 18, 24, 87 *S.Ct.* 824, 828, 17 *L.Ed.*2d 705 (1967) (holding that, in order to conclude that federal constitutional error is harmless, court must find that error "harmless beyond a reasonable doubt").

■ Previously, we have evaluated claims involving the denial of a defendant's right to testify under the *Strickland/Fritz* test. *Savage, supra*, 120 *N.J.* at 631, 577 *A.*2d 455. Notwithstanding the unique nature of a defendant's testimony, we continue to believe that the *Strickland/Fritz* test, *see supra* at 251 – 52, 736 *A.*2d at 478–79, applies to the issue before us. Several federal courts likewise have required defendants to prove that they have been prejudiced by defense counsel's failure to inform them of the right to testify. *See, e.g., United States v. Tavares*, 100 *F.*3d 995 (D.C.Cir.1996) (rejecting rule under which defense counsel's performance resulting in denial of defendant's right to testify constitutes prejudice *per se* ); *Ortega v. O'Leary*, 843 *F.*2d 258, 262 (7th Cir.1988) (applying harmless-error analysis to denial of right to testify); *Campos v. United States*, 930 *F.Supp.* 787 (E.D.N.Y.

1996) (holding that analyzing denial of right to testify as claim of ineffective assistance of counsel is soundest approach). Counsel's failure to inform defendant of his right to testify is not "so likely to prejudice the accused that the cost of litigating [its] effect in a particular case is unjustified." *United States v. Cronic*, 466 *U.S.* 648, 658, 104 *S.Ct.* 2039, 2046, 80 *L.Ed.*2d at 667.

Even if Aifer had informed Bey that the ultimate decision to testify was his to make, his testimony would not have affected substantially the penalty-phase deliberations. In brief, defendant has not satisfied the showing of prejudice required by the second prong of the *Strickland/Fritz* test.

Defendant was aware of his right to testify from his experience in his two previous murder trials. During the original Alston trial in 1983, defendant's attorney, William Gearty, informed the court that he had advised defendant of his right to choose whether to testify:

> Your honor, in this matter, I have discussed with the defendant his rights as guaranteed by the Constitution of the United States and the Fifth Amendment. I have advised him at this proceeding on the issue of guilt at his option, he may chose not to testify in his own defense.
>
> I've explained that to him. I'm convinced that he understands it. I am convinced also that after our discussion of the matter he has knowingly and intelligently waived that right to testify on his own behalf and has indeed elected not to testify in this, the guilt phase of the trial.

After a colloquy with defendant, the court concluded that it was "convinced defendant understands the nature of what he is doing."

One year later, in the 1984 Peniston trial, defendant asserted his right to choose whether to testify. Defendant asked the court to remove Gearty as his counsel for advising him to testify. The effect, according to defendant, would have been the relinquishment of defendant's privilege against self-incrimination.

> Your Honor, I wish to ask this Court to have my present counsel, Attorney Gearty, removed from this position of representing me in this penalty phase of my trial.... I state that rather than defending me, Attorney Gearty jeopardized my defense and my life by his lack of argument against the prosecution's presentations against me and I further state that his advice to me leading me at his direction to place myself where unrealizing and in evidence, gave up my right to refrain from self-

incrimination and upon his direction in capsule, testified against myself in that direction and that direction and advice from counsel to self-incriminate is the opposite of any defense attorney's duty.

Defendant's request that the court remove Gearty as his attorney demonstrates his understanding that he had the right to decide whether to testify. Defendant, however, argues that his statement illustrates his failure to understand that the right to make the decision was his. According to defendant, the statement highlights defendant's belief that he was compelled to follow counsel's advice, even if defendant disagreed. Finally, defendant states that his remarks indicate his familiarity only with the right to remain silent, but not with the corresponding right to testify. We disagree.

First, defendant's statement in 1984 confirms that his attorney, Gearty, merely advised, rather than compelled, defendant to testify. If defendant had not known that he could override Gearty's advice, he would not have requested the court to remove Gearty as his counsel. Second, defendant's statement, although it reflects his intention to remain silent, supports the finding that defendant, in accordance with his attorney's advice, had made the original decision to testify. Thus, as far back as 1984, defendant knew both of his right to testify and of the correlative right to remain silent.

Defendant's assertion of his right to remain silent in 1984 confirms the conclusion that defendant did not want to testify at the 1990 penalty-phase retrial. In 1984, defendant realized that his testimony, particularly that part elicited on cross-examination, had damaged his case. In the present matter, defense counsel so advised defendant after reaching the same conclusion. Thus, at the 1990 penalty-phase hearing, Aifer told defendant that testifying would be "a very risky thing to do." Aifer's co-counsel, McCauley, agreed that defendant would not be an effective witness because of "halting speech" and his inability to withstand cross-examination. Defendant's disastrous testimony in the Peniston trial six years earlier and his aversion to testifying in the present matter undermine the unsubstantiated assertion on appeal

that defendant wanted to testify at the penalty-phase hearing in 1990.

Defendant, however, asserts that after already experiencing a "sharp" cross-examination in 1984, he would have been better prepared to withstand cross-examination in 1990. He contends that because "his guilt had been established, and the first penalty trial had resulted in a verdict of death ... something had to be done to avert the same outcome." These assertions are unpersuasive. If defendant had taken the stand, his testimony would have focused on his claim that on the night of murder he was intoxicated—the precise subject of defendant's cross-examination at the 1984 trial. The State, moreover, could have cross-examined defendant on the basis of his testimony at that trial. After hearing defendant's testimony in 1984, the jury had convicted defendant and sentenced him to death. To avert the same outcome, trial counsel understandably would have considered a strategy that did not involve subjecting defendant to withering cross-examination.

Lastly, defendant's request in 1984 for the removal of Gearty as his attorney demonstrates his willingness to disagree with counsel in open court. In the present proceeding, defendant had the opportunity to communicate his desire to testify during a colloquy among the court, defense counsel, and defendant:

Court: Might I inquire of you now, to as to whether or not the Defendant wants to—wants me to instruct the Jury about his constitutional right to remain silent?

Aifer: No.

Court: Does not?

Aifer: No.

Court: Discussed it with him?

Aifer: I will.

Court: Okay. Then you advise me as to whether he wants the charge. Okay?

Aifer: The charge I assume is likened to the charge in cases [where] the Defendant doesn't testify?

Court: Yes.

Aifer: The charge is given that he has the right to remain silent? He is indicating that he does not want it.

Court: You discussed it with him and do you understand the charge?

Defendant: Yes.

Court: Okay. And you don't want that charge given to the jury?

Defendant: No. No.

In the 1984 proceeding, when he requested the discharge of his attorney, defendant registered his objection to having testified. His failure to object in 1990 suggests his acquiescence to Aifer's statement that he would not testify.

We conclude that defendant was aware of his right to testify and decided not to exercise this right at the penalty-phase trial. In sum, defendant knowingly and voluntarily waived his right to testify. Therefore, defendant's ineffective assistance of counsel claim must fail.

## B. *Right of Allocution*

Defendant did not read a statement of allocution to the penalty-phase jury. He now claims that the trial court and his attorney deprived him of the right of allocution.

 A capital defendant has a common-law right to present a statement of allocution to the penalty-phase jury. *Ibid. State v. Zola*, 112 *N.J.* 384, 429–30, 548 *A.*2d 1022 (1988) (quoting *McGautha v. California*, 402 *U.S.* 183, 220, 91 *S.Ct.* 1454, 1474, 28 *L.Ed.*2d 711, 733 (1971), *vacated on other grounds*, 408 *U.S.* 941, 92 *S.Ct.* 2873, 33 *L.Ed.*2d 765 (1972)), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). The right of allocution is designed to ensure that a "defendant not be sentenced to death by a jury 'which never heard the sound of his voice.' ".

 "During allocution, a defendant is permitted to make a brief statement in order to allow the jury to ascertain that he or she is an individual capable of feeling and expressing remorse and of demonstrating some measure of hope for the future." *State v. Loftin*, 146 *N.J.* 295, 361, 680 *A.*2d 677 (1996) (*Loftin I* ). A defendant, however, may not use allocution to rebut facts in evidence or to deny his guilt. *Zola*, *supra*, 112 *N.J.* at 430, 548 *A.*2d 1022. If the defendant makes an impermissible statement, the court may strike the offending portions, allow the State to

respond, or permit limited cross-examination of the defendant. *Ibid.*

The trial court must engage defendant in a colloquy to apprise defendant of his right of allocution. *Bench Manual for Capital Causes* Appendix Q. Here, however, defendant did not assert his right of allocution at trial or on direct appeal. For the first time, he now argues that the trial court erred by failing to inform of his right of allocution.

A challenge to the trial court's failure to afford defendant an opportunity to make a statement of allocution must be raised on direct appeal. *State v. Cerce*, 46 *N.J.* 387, 396, 217 *A.*2d 319 (1966). Furthermore, defendant's claim is barred by *Rule* 3:22–4, which provides:

> Any ground for relief not raised in a prior proceeding ... is barred from assertion in a proceeding ... unless the court ... finds (a) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding; or (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey.

None of the three exceptions applies in this case. Defendant did not raise his right of allocution on direct appeal. For the following reasons, that failure bars his challenge on post-conviction relief. First, the denial of the right of allocution was apparent from the record. Defendant, therefore, reasonably could have raised this objection on direct appeal. Second, the denial of the right of allocution does not result in fundamental injustice. Although "our civilization commends" permitting a defendant to express his remorse and make a plea for mercy, *Zola, supra,* 112 *N.J.* at 429, 548 *A.*2d 1022, such an expression is not essential to "provide[ ] the defendant with fair proceedings leading to a just outcome," *State v. Mitchell,* 126 *N.J.* 565, 587, 601 *A.*2d 198 (1992). Even in the absence of a statement made in allocution, the jury must reach a "rational fact-based conclusion on whether he shall live or die." *Zola, supra,* 112 *N.J.* at 430, 548 *A.*2d 1022. Third, the denial of the right of allocution, which is grounded in the

common law, does not contravene the federal or state constitutions.

Defendant next alleges that Aifer's assistance was ineffective because she did not inform him of his right of allocution. Instead, Aifer unilaterally decided not to use an allocutory statement that defendant had drafted.

 Contrary to the dissent, we do not review the denial of the right of allocution in a vacuum. "The claims of ineffective assistance of counsel in the penalty phase can fairly be assessed only in the context of the entire trial record and of the grave offenses of which defendant was convicted." *Marshall III, supra,* 148 *N.J.* at 252, 690 *A.*2d 1.

The PCR court concluded that the decision whether a defendant should make a statement of allocution is a matter of trial strategy best left to counsel. At the PCR hearing, Aifer testified that she had not used defendant's proposed statement because portions of it were inadmissible and would subject defendant to cross-examination. In the statement, defendant denied that he had committed purposeful or knowing murder and attempted to rebut the testimony of the mental health experts. Aifer concluded that the jury might find the statement insincere. On summation, moreover, the prosecutor could have attacked the sincerity of any such statement. Consequently, the PCR court held that Aifer had made a reasonable strategic decision for defendant not to make a statement in allocution.

 Fundamentally, the right of allocution, like the right to testify, is a personal right that defendants themselves decide whether to exercise. Accordingly, the trial court should address the defendant, rather than counsel, concerning the right of allocution. Defense counsel should not make an independent strategic decision whether defendant should exercise that right. Instead, as with the right to testify, defense counsel should consult with their clients so the clients can make their own informed decisions.

It follows that defense counsel should inform the defendant of the right of allocution or ensure that the trial court apprises the defendant of this right. Moreover, as with the right to testify, counsel must advise the defendant on the issue whether to submit a statement of allocution to the jury

> and to explain the tactical advantages or disadvantages of doing so or not doing so. Counsel's responsibility includes advising a defendant of the benefits inherent in exercising that right and the consequences inherent in waiving it. . . . Indeed, counsel's failure to do so will give rise to a claim of ineffectiveness of counsel.
>
> [*Savage, supra*, 120 *N.J.* at 630–31, 577 *A.2d* 455 (discussing right to testify).]

▇▇▇ Here, Aifer should have requested the trial court to engage defendant in a sufficient colloquy concerning the right of allocution. Instead, after consulting with defendant, she simply asked him on the penultimate day of the trial to "write out if I could say something to the jury, what would I say." Although Aifer informed defendant of the purpose of this statement, she did not explain the limits of such a statement or that it would not necessarily subject him to cross-examination. Once defendant completed his statement, Aifer "glanced at" and rejected it. Rather than discussing the advantages and disadvantages of allocution, she decided unilaterally not to use his statement. On these facts, we conclude that counsel's performance was deficient.

▇▇▇ We therefore turn to the question whether counsel's deficiency prejudiced defendant. Once again, we resist defendant's suggestion that we presume prejudice. The evaluation of a claim that defense counsel did not fulfill the duty to inform a defendant of the right of allocution is like the evaluation of other ineffective-assistance-of-counsel claims, including those involving the right to testify. *See supra* at 252–56, 736 *A.2d* at 479–81.

Our review of the record leads us to conclude that a statement of remorse by defendant would not have substantially affected the jury's deliberations. Two days before the end of the trial, defendant drafted the following statement at the request of his attorney:

Morning Ladies and Gentleman of the Jury I know that you may want to hear from me on why my Life should be spared by you. As you know from the Various Doctors that testified in this proceeding I'm not good at explaining myself vocally. So instead I am writing this letter to you and speak to you on this matter. I do not know if Judge Arnone will allow you to read this or let this be read to you but I'm trusting that he will.

The crime's that have me before you in this matter there is no excuse that I can give and what I write is not to be taken as one, this is only to let you know some of my feeling's.

At the time of this crime, I was 18 yr's old and am now 25 yr's old, and I will live with this pain for the rest of my LIFE knowing this. I cannot tell you why someone was murdered that night nor can anyone else in this court room. I say this because I have not been able to answer this question to myself. But over these 7 yr's I have thought about why a murder took place that night and even tho I have not still understood it, I do know that I could not and would not ever intentionally take someone's life away for any reason. That I know for sure.

People say that I don't show any emotion's but that is not true. When I think about what happened I do cry and ask forgiveness from the Alston and Peniston Families when I am in my cell at night or think about what happened. But how can I ask them for forgiveness or let them know that when I cry at night I cry for them also. I have told them that I am sorry and meant it, when I say these thing's to them tho, someone say's that I don't mean it or when I don't say anything they say that I don't have any remorse but the people who make these statement have not sat down with me to see what I am feeling. Before this crime took place, I had not cried for a long time, but now in these 7 yr's I have cried a lot, and within myself I know that my sorrow is knowing that what happened was wrong and for the Peniston Family, and to say to them again that I am sorry.

Ladies and Gentleman Thank You for this chance to speak to You.

The statement is problematic. Specifically, in the third paragraph, defendant disputes that he had committed a knowing or purposeful murder of Peniston. That assertion contradicts the jury's finding in the guilt phase. Even if defense counsel had advised defendant to eliminate that denial and to plead for mercy, the record demonstrates that the plea would not have had a substantial propensity to affect the jury's deliberations.

In his original trial in 1984, defendant testified similarly about the remorse he felt as a result of the murder. While under oath, defendant told the 1984 jury that:

I apologize to the family. I apologize to anybody sitting over there for putting you all into this predicament. And I have been taken drugs since I was thirteen, fourteen years old. And it came to the point where the drugs was my way of life.

It was a necessity. A need. And maybe if I never would have taken the drugs it never would have happened.

But it did. And it came around to the situation where I needed drugs to forget. You know. Personal problems and things like that. And from when I was thirteen or fourteen I have taken just about every kind of drugs there was. Heroin and acid. And I started depending on the drugs from all different types of reasons. And it got out of hand and to the point where I couldn't control it no more. And like I told the Peniston family, I never would have got involved in drugs. I know for certain—that that would never happen. I would never have been in the predicament where this would have happened. Unfortunately, it did happen. And I'm really—you know.

I can't really express to you how sorry I am. I'm trying. And since the Peniston family has been in the courtroom from day one, when I told them a few minutes ago I was sorry, that was the first time I could actually look at them, tell him I'm sorry. And right now I can only try to explain to you how sorry I am. And I don't want to be put to death. And I'm sorry for putting my mother and my brothers and my aunt, my whole family through this predicament, the Peniston family and everybody else on the jury.

Despite this plea, the jury sentenced defendant to death.

The jury, albeit after receiving erroneous instructions on the need for unanimity concerning the mitigating factors, found no such factors. As Aifer testified, defendant's counsel in 1984 believed that the jury was not persuaded by defendant's expression of remorse. Nothing indicates that a statement of remorse would have substantially affected the jury's deliberations in 1990.

Aifer also represented defendant in the Alston murder trial. As defendant's counsel, she was best positioned to determine how defendant's allocution would affect the jury. At the PCR hearing, Aifer testified that she believed that the allocution would not have swayed the jury:

[R]emember that it's not just evaluating the statement in the abstract. It's evaluating its impact on the jury, on the jury that I'd been watching during the trial, on a jury that had heard evidence presented to them over the course of several days. And I had to evaluate the persuasiveness of this statement in light of all that. And it [the decision not to use the statement] was ultimately the conclusion that I came to.

Additionally, Aifer expressed reluctance to use any of defendant's statements of remorse because any such statement would have allowed the State to "ridicule the expression of remorse as being something that was done to avoid being punished for his crime":

I felt, quite honestly, that as much as I wanted to present Mr. Bey to the jury in as sincere and basically human—and humanized light as possible, I didn't think that his standing and reading a prepared statement to them was going to accomplish that and may possibly have angered or offended some of the jurors, not intentionally, not because I thought he would say anything improper, but because they just might not accept the sincerity of it.

At the PCR hearing, Aifer's co-counsel, McCauley, testified that defendant's statement expressed remorse, "deep sympathy for the families of the victims and a living hell he has to endure with these thoughts." He admitted that at the time of the trial, however, he dismissed the effectiveness of an allocution, even without having read the statement.

I recall at the time not thinking that it would be effective, that I thought the hearing was going well, and just having the question posed to me, "what do you think of him getting up and saying I'm sorry," it didn't strike me as being effective before the jury.

Aifer's trial strategy was to introduce evidence of defendant's remorse without subjecting defendant to criticism by the prosecutor. Although Aifer did not utilize defendant's own statement, she introduced evidence of defendant's remorse through two mental health experts.

Dr. Young testified at the 1990 penalty-phase trial about his meeting with defendant:

I saw him crying while he told me what it was like to read the paper about what happened to Ms. Peniston. And he stopped, he lowered his eyes and his hands and he paused for some length before he could go on and explain and as he explained, that it was in the reading of the paper that the reality really hit him. He reached up and was rubbing his eyes and I could see when he wiped his hands they were wet. That he was moved by this recollection. I was not talking with him about potential of death penalty or things of that sort, I was talking with him about what happened a few days or short time after this crime and trying to get his own spontaneous emotional reaction and that was what came out of that.

Dr. Pincus also described his contact with defendant at the penalty-phase hearing:

I asked him questions designed to determine if a person is depressed. And one of the things I asked, "Do you feel guilty?" Very often people who are depressed feel guilty. He took that question literally and said, well, yes and no. And he said he felt, yes, because there are two people who are dead. And he became—his eyes welled with tears when he said that. And he said, on the other hand, he said, "I don't see how I could have done such a thing. It doesn't sound like me." He said

if anybody—he went on to say, "If anybody were to give me my freedom and lots of money in return for killing somebody, I wouldn't be able to do it." He said it so sincerely that I believed him.

Theoretically, a defendant's personal statement may have a stronger impact on a juror. Here, however, the statement of defendant's remorse, as related by the expert witnesses, may have been more effective.

In addition to the expert testimony, Aifer told the jury in her penalty-phase summation that "of course [defendant] feels guilty about [the murder]. He is guilty of it. We know that. That's not an issue and he's responsible for it." She stated that defendant is frustrated that he can't recall the events and does not know why it happened. "This is not someone who as I may have said on my opening gloried in his killing or enjoyed the shedding of blood or is proud of his work or feels that he was justified or anything like that."

Lastly, whether defendant would have delivered the allocution, even if properly advised, is pure speculation. Indeed, the available evidence suggests that defendant would not have submitted the statement. In defendant's presence, the trial court asked defense counsel whether defendant chose to make a statement to the jury:

Court: Ms. Aifer, based on the case of State v. Zola and reaffirmed in State v. Clausell [, 121 N.J. 298, 580 A.2d 221 (1990)], I neglected to inquire of you and your client if he chose to make a statement, unsworn statement to the Jury?

Aifer: No, sir.

Although defendant heard his attorney's refusal, he did not object.

Defendant's silence contrasts with his actions in 1984, when he expressed to his defense counsel a request to apologize personally and to plead for mercy. In 1990, defendant did not repeat this request to Aifer, even after she told him she did not intend to use his proposed statement.

The dissent proceeds on the assumption that defendant would have read a statement in allocution to the jury if Aifer had informed him of his right to do so. See post at 304, 736 A.2d at

508. The record, however, suggests the likelihood that defendant had no desire to read such a statement.

Before us, defendant contends that the statement itself, which indicates defendant's desire to make a statement in allocution, reflects that defendant "trusted" that the court would allow the jury to read the statement. In his PCR testimony, however, defendant testified that he "wasn't hoping anything" in particular would happen with the statement.

In concluding that defendant demonstrated that Aifer's ineffective assistance substantially affected the jury's deliberation, the dissent relies on its own characterization of defendant's statement as "a powerful expression of defendant's feelings of remorse." *Post* at 305, 736 *A*.2d at 509. The statement was similar to one rejected by a previous jury in 1984. None of defendant's attorneys believe the statement had a reasonable probability of affecting substantially the deliberations of the penalty-phase jury. We likewise conclude that the record fails to demonstrate a reasonable probability that the statement would have affected substantially those deliberations.

## IV.

### *Ineffective Assistance of Counsel in Preparation of Motion*

In *State v. Gerald*, 113 *N.J.* 40, 549 *A*.2d 792 (1988), we held that a murder committed with the intent to cause serious bodily injury, as opposed to the intent to kill, is not death-eligible. *But see* Amendment to *N.J. Const.* art. I, ¶ 12 (overruling *Gerald* holding). Defendant's guilt-phase trial was conducted before our holding in *Gerald*. On direct appeal, defendant argued that he should receive a new guilt phase trial because the facts provided a rational basis to believe that he intended merely to cause serious bodily harm. We rejected the argument. *Bey III, supra,* 129 *N.J.* at 580, 610 *A*.2d 814.

Capital murder convictions rendered before *Gerald* are reversible only if the jury "rationally could have convicted" the

defendant of causing serious bodily injury resulting in death. *Gerald, supra,* 113 *N.J.* at 92, 549 *A.*2d 792. In *Bey III,* we concluded that the evidence led to the conclusion that defendant's intent was to kill, not merely cause serious bodily injury, to his victim.

> When a defendant employs various means of violence against the same victim, we need not focus on which method actually succeeded in causing death. Rather, we find that defendant's actions, taken as a whole, were so wantonly brutal that he could have intended only to cause death, or knew that death was practically certain to occur. Overall, we find that defendant's strangulation of the victim and the degree of force applied to the victim's head and chest make it simply "inconceivable that defendant was not 'practically certain' that his action would kill the [victim]."
>
> [*Bey III, supra,* 129 *N.J.* at 580, 610 *A.*2d 814.]

Defendant now contends that, in light of the *Gerald* holding, McCauley, his co-counsel, was ineffective in preparing a motion for a new guilt-phase trial. When drafting the motion, McCauley relied on the medical examiner's testimony and the autopsy report introduced during the guilt-phase of the original trial. He did not review the autopsy report or crime-scene photographs. Nor did he retain an independent pathologist to examine the photographs. At the PCR hearing, the defense introduced testimony from a pathologist, Dr. Karl Schwarz. Dr. Schwarz testified that blunt trauma to the heart and the head were as capable as ligature strangulation of having caused Peniston's death. Defendant reasons that Dr. Schwarz's testimony supports defendant's theory that he did not strangle the victim for the time necessary to kill her. Instead, defendant asserts that Peniston died suddenly and unexpectedly from the head and chest trauma. According to defendant, this theory provides a rational basis for convicting him of serious-bodily-injury murder.

The PCR court, relying on our decision in *Bey III* that defendant's strangulation and other violent acts demonstrated that defendant purposefully or knowingly murdered Ms. Peniston, rejected defendant's claim. We likewise reject the claim.

Even if McCauley should have sought a second opinion from a pathologist, such testimony would not have affected the outcome of the *Gerald* motion for a new trial. On direct appeal, we held,

regardless of the actual cause of death, that defendant's actions demonstrated that he had formed the intent to kill. As we stated, "defendant not only strangled the victim from behind, he also smashed her face hard enough to break her dental plate and cause cerebral hemorrhaging, and he stomped on her chest with enough force to crush her ribs, damage her heart and inscribe his sneaker sole on her chest." *Bey III, supra,* 129 *N.J.* at 580, 610 *A.*2d 814. The degree of force defendant exerted was central to our finding that defendant acted with the intent to kill. Traumatic injuries to the victim's heart and head, as opposed to strangulation, may have been the actual cause of death. That fact, however, does not negate our conclusion that "the evidence that defendant intended to cause death or knew that death was practically certain to occur is so compelling as to exclude the possibility that he possessed a less culpable state of mind." *Id.* at 581, 610 *A.*2d 814. Defendant's motion for a new trial would have been denied even if McCauley had consulted a pathologist or taken other action in preparation of the motion. Thus, we find no prejudice to defendant.

## V.

*Newly Discovered Evidence of Defendant's Diminished Capacity*

Finally, we conclude that the cumulative effect of the deficiencies of the defendant's trial counsel did not deprive him of a fair trial.

Defendant claims that the expert testimony presented at the penalty-phase retrial that he suffers from organic personality syndrome constitutes newly discovered evidence of his diminished capacity at the time of the murder. He contends that this evidence could have provided the 1984 guilt-phase jury with a rational basis for finding that he acted with an intent to cause serious bodily injury rather than an intent to kill. Defendant therefore urges the Court to vacate his death-eligible murder conviction and remand the case for a new guilt-phase trial.

Before reaching the merits of this issue, we first address the State's objection that the issue is procedurally barred under *Rule* 3:22–4 because defendant could have raised this claim on direct appeal. *Rule* 3:22–4 provides an exception where "denial of relief would be contrary to the Constitution of the United States or the State of New Jersey."

As the PCR court found, defendant's claim falls within that exception. If the newly discovered evidence demonstrates that defendant could not have formed the intent to kill, then defendant's conviction for death-eligible murder would be vacated in accordance with the State constitution as it existed at the time of the murder. *See Gerald, supra,* 113 *N.J.* at 69, 549 *A.*2d 792. Thus, we will relax the procedural bar and turn to the merits of defendant's argument.

At the 1990 penalty-phase proceeding, defendant's three experts testified that defendant suffers from organic personality syndrome caused by brain damage. This disorder interferes with the ability to control emotional responses and aggressive impulses. The condition, according to Dr. Young, causes defendant to forget his actions because "his mind is not recording the way it normally does in day to day experience, during the time when the murder is actually happening." Dr. Young did not believe that "at the time that the murders took place [defendant] was in command of his ability to appreciate the wrongfulness of murder or necessarily even to know that murder was about to happen or in the process of happening." He surmised that defendant most likely lost the ability to formulate any intent after he committed the sexual assault, but before committing the murder. According to Dr. Young, defendant probably already had lost control of his actions when he began to beat and strangle the victim.

Dr. Pincus testified that defendant is "a little brain damaged, . . . and has a little bit of more trouble than you or I would have had in controlling the impulses." He concluded that defendant was "out of control" when he committed the murder.

Dr. Kay described defendant's dysfunction as "mild" and explained that defendant does not exhibit symptoms of schizophrenia or any other severe psychotic disorder that would have impaired his ability to reason. Additionally, Dr. Kay stated that three medical tests performed on defendant did not show any structural abnormalities in defendant's brain.

Newly discovered evidence warrants a new trial only if the evidence is (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted. *State v. Carter,* 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981).

Defendant maintains that two cases, *Gerald, supra,* and *State v. Galloway,* 133 *N.J.* 631, 628 *A.*2d 735 (1993), both decided after defendant's guilt-phase trial, establish the relevance of defendant's organic personality disorder to re-evaluation of defendant's state of mind. According to defendant, *Gerald* provided him with a reason to develop evidence that, as a result of his diminished capacity, he had the ability to form only the intent to cause serious bodily harm, but not the intent to kill. *Galloway,* defendant contends, held that all mental deficiencies, including disorders that cause a loss of emotional control, can support a diminished-capacity defense.

Before the guilt-phase trial, a psychiatrist, Dr. John P. Motley, examined defendant. Dr. Motley found that defendant, although not insane, suffered from an antisocial personality disorder. Defendant, however, maintains that before *Galloway,* defense counsel had no reason to ask Dr. Motley to consider whether defendant's mental disease precluded him from forming the requisite intent. The import of defendant's argument is that counsel, through the exercise of reasonable diligence, could not have discovered that defendant's organic personality syndrome impaired his ability to form the intent to kill.

The PCR court determined that the subsequent developments in the law made it reasonable that evidence that defendant suffered from organic personality syndrome was not adduced before the guilt-phase trial. The court, however, found that the evidence provided by the three expert witnesses was cumulative and probably would not have changed the outcome of the guilt-phase trial.

In 1984, before *Gerald,* counsel understandably did not present evidence supporting the distinction between the intent to cause serious bodily harm and the intent to kill. Therefore, we consider whether the newly discovered evidence, by providing a rational basis for convicting defendant of serious-bodily-injury murder, probably would have changed the jury's verdict.

Our review of the expert testimony leads us to conclude that the new evidence of defendant's mental disorder does not provide such a basis. Viewed in the light most favorable to defendant, the testimony does not support a distinction between defendant's ability to form the intent to cause serious bodily injury and his ability to form the intent to kill. Dr. Kay and Dr. Pincus did not connect defendant's personality disorder to a loss of cognitive function. Mental conditions that cause a loss of control may satisfy the diminished-capacity defense only if "the record shows that experts in the psychological field believe that that kind of mental deficiency can affect a person's cognitive faculties, and the record contains evidence that the claimed deficiency did affect the defendant's cognitive capacity to form the mental state necessary for the commission of the crime." *Galloway, supra,* 133 *N.J.* at 647, 628 *A.*2d 735. Here, in contrast, Dr. Kay testified that defendant's ability to reason was not affected. Likewise, Dr. Pincus merely described defendant's impairment as a loss of control.

Although Dr. Young testified that defendant's mental disorder affected his ability to form an intent to murder, Dr. Young also noted that defendant lost control over his cognitive capacity after the sexual assault, but before he began to beat and strangle his victim. If anything, defendant's diminished capacity would pre-

clude a finding that he intended to inflict any violent injuries on Ms. Peniston. The testimony does not support a finding that he beat and strangled his victim with the intent to cause serious bodily harm as opposed to death.

Defendant does not claim that the expert testimony would support a jury finding that defendant was unable to form any intent. Consequently, we need not determine whether *Galloway* articulated a novel rule of law that would excuse defense counsel's failure to present evidence of defendant's personality disorder. Nevertheless, even if defendant did raise this claim, he could not satisfy the requirement that the evidence probably would have changed the guilt-phase jury's verdict. *Carter, supra,* 85 *N.J.* at 314, 426 *A.*2d 501. After hearing the testimony from defendant's experts, the 1990 penalty-phase jury unanimously rejected the diminished-capacity mitigating factor. It is unlikely that this evidence of defendant's organic personality syndrome would have persuaded a jury that he had satisfied the diminished-capacity defense.

## VI.

### *Adequacy of Instruction Concerning Defendant's Parole–Ineligibility Period*

A. *Jury's Verdict*

On direct appeal, defendant challenged the trial court's refusal to instruct the penalty-phase jury that, if defendant was not sentenced to death, he would be sentenced to two life sentences with an aggregate seventy-year parole ineligibility period, for both the Peniston and Alston murders. The court charged the jury only with respect to defendant's alternative sentence for the Peniston murder, a life sentence with a thirty-year parole ineligibility period. We found that the court's failure to instruct the jury constituted harmless error. *Bey III, supra,* 129 *N.J.* at 606, 610 *A.*2d 814. As we stated, "based on our thorough review of the record, we conclude that the jury was fully informed of the practical consequences of imposing a life sentence in this case."

*Id.* at 604, 610 *A.*2d 814. To support that conclusion we relied on statements made by the court and counsel during the *voir dire* and by both defense counsel and the prosecutor in their summations. *Ibid.*

At the PCR proceeding below, defendant sought to prove that the error was not harmless. Defendant argued that consideration of the seventy-year period of parole ineligibility would have led some jurors to believe that a life sentence was sufficient punishment. The PCR court denied defendant's request for an evidentiary hearing on this issue. Defendant urges that: (1) he should be permitted an evidentiary hearing to develop evidence of the prejudice; (2) this Court's ruling on direct appeal is in violation of the United States Supreme Court's holding in *Simmons v. South Carolina,* 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L.Ed.*2d 133 (1994); and (3) this Court failed to address on direct appeal all of the grounds for reversal that defendant had raised.

 First, defendant objects to the PCR court's denial of his request to hold an evidentiary hearing. This request focused on resolving the alleged ambiguity of the jury's verdict. We described the relevant facts in *Bey III:*

> Approximately two hours into their deliberations, the jury sent the trial court a note with the following question: "Is Mr. Bey ever eligible for parole in the next seventy years?" Some time elapsed before the court met with counsel to discuss the jury's question.... Nearly one hour after the note had been sent, the court officer interrupted that discussion by announcing that "[t]he Foremen [sic] informed me he has a verdict and they don't need an answer to the question." When the jury was brought into the courtroom, the trial court engaged in the following colloquy:
>
> THE COURT: And before I answered your question, you advised the Court that you had a verdict and you didn't want this question answered, is that correct?
> THE FOREMAN: That's correct.
>
> [*Bey III,* 129 *N.J.* at 605–06, 610 *A.*2d 814.]

The court also explained the situation on the record:

> [B]etween [the first note] and my coming from the bench, I also got a message from the Court Officer that they had a verdict depending upon—they had a verdict.

Defendant asserts that the court's initial use of the words "depending upon" suggests that the verdict was conditioned on

receiving an answer to the question about defendant's parole ineligibility period. Defendant sought the evidentiary hearing to ask the jurors what they had told the court officer and to interview the court officer who had relayed the message from the jury to Judge Arnone, and to question Judge Arnone about the meaning of his statement. Defendant asked Judge Arnone, as a potential witness, to recuse himself.

Judge Arnone denied each of defendant's requests, reasoning that this Court had determined in *Bey III* that the jury did not require an answer to its question before rendering its verdict. On appeal, defendant seeks permission to interview the jurors and the court officer. *Unfortunately, during the pendency of this appeal, Judge Arnone died.*

In *Bey III*, we stated:

> The question can be understood in two different ways: either the jury was confused about the length of the parole-ineligibility period, or the jury was asking whether the defendant could be paroled at any time before the completion of the seventy-year period. We find the latter reading more plausible because the phrasing of the question itself reveals that the jury knew the aggregate parole-ineligibility period from two life sentences would be seventy years. More importantly, though, the jury reached its verdict without waiting to have its question answered.

> *Bey III, supra,* 129 *N.J.* at 606, 610 *A.*2d 814.

The trial court's initial misstatement does not provide a sufficient basis for conducting an evidentiary hearing. The foreman told the court that the jury did not need an answer to the question about defendant's parole ineligibility period. When questioned by Judge Arnone, the court officer summarized the jurors' communication: "They knocked and said they had a verdict and I informed Judge Arnone, who was with Judge Ricciardi at that time."

*Rule* 1:16–1, "Interviewing Jurors Subsequent to Trial," states:

> Except by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney interview, examine, or question any grand or petit juror with respect to any matter relating to the case.

The record does not support the requisite a finding of "good cause." As we have stated, "[C]alling back jurors for interroga-

tion after they have been discharged is an extraordinary procedure which should be invoked only upon a strong showing that a litigant may have been harmed by jury misconduct." *Loftin I, supra,* 146 *N.J.* at 382, 680 *A.*2d 677 (citations omitted). The record does not demonstrate the requisite showing of harm. We therefore deny defendant's request for an evidentiary hearing and find that it was unnecessary for Judge Arnone to recuse himself from the PCR proceeding.

■ Second, defendant challenges our conclusion in *Bey III* that the trial court's refusal to instruct the jury concerning defendant's seventy-year parole ineligibility period was harmless error. Defendant contends that the conclusion contravenes the United States Supreme Court's holding in *Simmons, supra. Simmons* involved a defendant against whom the State asserted future dangerousness as an aggravating factor. 512 *U.S.* at 157, 114 *S.Ct.* at 2190. The Court held that the defendant was entitled to inform the jury that he would be ineligible for parole for life if he was not sentenced to death. *Id.* at 163, 114 *S.Ct.* at 2194. Here, in contrast, the State did not argue that the jury should consider defendant's future dangerousness. We similarly distinguish *Simmons* and *Loftin,* where we stated:

> [T]he State did not proffer defendant's "future dangerousness" as an aggravating factor and the only available alternative sentence to death was not life imprisonment without the possibility of parole. Future dangerousness is not an aggravating factor in New Jersey, and our statute limits prosecutors to the enumerated aggravating factors.
>
> *Loftin I, supra,* 146 *N.J.* at 371, 680 *A.*2d 677.

Additionally, defendant's alternative sentence allowed for the possibility, as slight as it may be, of parole. Defendant further contends that the "prior murder" aggravating factor equates with "future dangerousness," a contention that we implicitly rejected in *Loftin I.* In *Loftin I,* we concluded that *Simmons* did not apply despite the fact that the jury had found the prior-murder aggravating factor. We reach the same conclusion here. In addition, the United States Supreme Court recently held that *Simmons* established a "new rule of law" that, based on federal retroactivity principles, should not be applied on collateral review. *See O'Dell*

*v. Netherland,* 521 *U.S.* 151, 117 *S.Ct.* 1969, 138 *L.Ed.*2d 351 (1997).

Third, defendant claims that this Court did not address several related arguments in *Bey III.* Defendant contends that he was deprived of his right to a fair trial and the right to the intelligent use of his peremptory challenges because *voir dire* proceeded on the premise that the alternative to death was two life sentences with an aggregate seventy-year parole-ineligibility period. According to defendant, the trial court's erroneous instructions violated his Eighth Amendment right to a reliable penalty-phase trial. He asserts that several jurors stated or implied that they could not deliberate impartially between sentencing alternatives of death and a thirty-year parole ineligibility period. Lastly, defendant urges the Court to adopt a rule that trial judges must decide before the penalty-phase proceeding whether non-capital sentences should be consecutive. These arguments overlap the defendant's previous contentions, which this Court resolved on direct appeal. *See Bey III, supra,* 129 *N.J.* at 606, 610 *A.*2d 814.

## B. *Court's Delay in Answering the Jury Question*

Defendant renews his contention, raised on direct appeal, that the trial court's delay in responding to the jury's question regarding the length of defendant's period of parole ineligibility coerced a verdict imposing a death sentence. As we held in *Bey III,* the delay did not constitute reversible error. 129 *N.J.* at 607, 610 *A.*2d 814. Relitigation of this issue is barred by *Rule* 3:22–5.

## VII.

### *Leading Questions*

Defendant asserts that his mother was an evasive witness at the penalty-phase proceeding. He argues that the trial court erred by prohibiting defense counsel from asking her leading

questions. On direct appeal, however, we held that the court's refusal to permit leading questions was harmless error:

> Notwithstanding the prosecutor's objections, the defense did elicit Ms. Bey's testimony that she drank heavily while pregnant with defendant, that she kept the apartment dark, and that she beat defendant so hard that on one occasion he blacked out and that on another occasion the neighbors threatened to call the police. Thus, Ms. Bey can hardly be characterized as an uncooperative, and thus hostile witness.

> *Bey III, supra,* 129 *N.J.* at 594, 610 *A.*2d 814.

Therefore, defendant's renewed claim is procedurally barred pursuant to *Rule* 3:22–5.

Additionally, this claim duplicates defendant's contention that his mother's testimony at the PCR evidentiary hearing would have provided support for the catch-all mitigating factor. As previously indicated, *supra* at 261–62, 736 *A.*2d at 484, Ms. Bey's PCR testimony, which was cumulative of testimony provided by other witnesses, would not have affected the jury's deliberations.

## VIII.

### *Instruction Regarding Unanimity of Guilt–Phase Verdict*

 Defendant argues that the trial court, in violation of *State v. Mejia,* 141 *N.J.* 475, 662 *A.*2d 308 (1995), did not instruct the guilt-phase jury that it could return a non-unanimous verdict that he intended to cause only serious bodily injury. The failure to provide this instruction, however, would constitute harmful error only if there were a rational basis to find that defendant acted with the intent to cause serious bodily injury. We have concluded that no rational basis exists for a finding of serious-bodily-injury murder. *Supra* at 286–88, 736 *A.*2d at 498–99. Consequently, this issue is irrelevant.

## IX.

### *Instruction Regarding Unanimity of Penalty–Phase Verdict*

 Defendant contends that the trial court's charge and the verdict sheet improperly directed the penalty-phase jury to reach

a unanimous verdict to impose a life sentence or a unanimous verdict imposing a death sentence. Defendant asserts that the court should have included non-unanimity, resulting in a life sentence, as a third verdict option on the verdict sheet.

This contention is without merit. The court instructed the jury that its failure to agree unanimously that defendant should be sentenced to death would result in the imposition of a life sentence. In his instructions, the trial judge told the jury:

In the process of weighing of the values represented by aggravating and mitigating factors, it is possible that the jurors will not be able after full and open deliberation to come to a unanimous conclusion one way or the other.

Of course, you should not come to that point simply to avoid a difficult decision. But, if after thorough, open and thoughtful deliberations positions are conscientiously arrived at by the individual jurors, which preclude the possibility of unanimity, your foreman should report that fact to the Court by a note to that effect.

If the Court agrees that such is a fixed state of the jury, then the Court will impose a sentence of life imprisonment with no parole available for thirty years.

Similarly, the verdict sheet identified non-unanimity as an option for the jury.

NOTE: If after full and considered deliberations you report to the Court that you are unable to unanimously agree on either punishment set forth above, and if the Court is satisfied that it is so, then the Court will sentence the defendant to imprisonment for life with no eligibility for parole for 30 years.

The court emphasized the need for the jury to engage in reasonable deliberations, but did not press the jury to reach a unanimous verdict. Thus, the court's instructions and the note on the verdict sheet did not coerce the jury improperly to reach a unanimous decision.

## X.

### *Proportionality*

Defendant argues that the death penalty is imposed in a racially discriminatory manner and is disproportionately imposed on mentally ill defendants. We already have found that defendant's death sentence is not disproportionate. *Bey IV, supra,* 137 *N.J.* at 334, 645 *A.*2d 685.

## XI.

### *Attorney–Client Privilege*

■ During the PCR proceedings, defendant's appellate counsel, Smith, withdrew from the case and became a defense witness. After Smith testified on direct and on cross-examination, the PCR court ordered him to produce memoranda of his conversations with defendant concerning the preparation of the petition for post-conviction relief. Defendant argued that the memoranda were protected by attorney-client privilege. The court overruled that objection and the memoranda were received into evidence. The memoranda provided the basis for additional cross-examination.

■ Before this Court, defendant renews his objection to the admission of the memoranda and the resulting cross-examination. By allowing Smith to testify, defendant waived the attorney-client privilege. This privilege, moreover, does not extend to communications relevant to an ineffective-assistance-of-counsel claim. *See* *N.J.R.E.* 504(2)(c). Lastly, the memoranda and Smith's testimony on cross-examination neither were referred to by the PCR court in its opinion nor are the bases for any conclusions by this Court. Thus, there was no error.

Defendant's death sentence is affirmed.

HANDLER, J., dissenting.

In 1984, defendant Marko Bey was tried and convicted of the capital murder of Carol Peniston and other related offenses. The jury sentenced him to death. The Court affirmed defendant's convictions but reversed his death sentence. *State v. Bey,* 112 *N.J.* 123, 548 *A.*2d 887 (1988) (*Bey II* ). A new penalty trial was held in 1990 and defendant was again sentenced to death. This Court affirmed defendant's death sentence. *State v. Bey,* 129 *N.J.* 557, 610 *A.*2d 814 (1992) (*Bey III* ), *cert. denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). The Court subsequently found that defendant's death sentence was not disproportionate. *State v. Bey,* 137 *N.J.* 334, 645 *A.*2d 685 (1994) (*Bey IV* ), *cert.*

*denied,* 513 *U.S.* 1164, 115 *S.Ct.* 1131, 130 *L.Ed.*2d 1093 (1995). Thereafter, defendant filed a petition for post-conviction relief (PCR). Defendant now appeals the denial of that PCR petition.

The denial of effective assistance of counsel is the thread that runs through virtually all of defendant's claims for PCR. Almost all of defendant's ineffective assistance of counsel claims pertain to the alleged inadequacy of R. Diane Aifer, Esq., lead counsel at defendant's retrial. Defendant claims that he was denied certain important constitutional rights and due process protections, and that the ineffectiveness of counsel contributed to those denials. The most prominent of defendant's circumvented rights was that of allocution. Counsel's ineffective assistance led to defendant's inability to exercise that right in spite of clear indications that he wanted to do so. Defendant was denied his right to testify in a similar manner. Counsel failed to advise defendant regarding the benefits and drawbacks of testifying, and unilaterally decided on defendant's behalf that defendant would not testify. Defendant also contends that counsel was ineffective because she failed to undertake necessary and adequate investigation in preparation for defendant's trial, and that this deficiency contributed to counsel's failure to present mitigating evidence that would have substantially affected jury deliberations in his penalty trial. Finally, defendant asserts that the trial court erred in failing to instruct the jury on the period of parole ineligibility attendant to the alternative sentence to a death verdict, and that the PCR court subsequently erred in denying defendant's request for an evidentiary hearing on the matter.

Those errors, individually and in aggregate, require that defendant's sentence be vacated.

## I

Trial counsel's ineffectiveness influenced nearly all of defendant's PCR claims. The standards by which we evaluate the performance of defense counsel in a capital-murder prosecution, therefore, are all-important. A criminal defendant has a constitu-

tional right to receive the effective assistance of competent counsel. *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984); *State v. Fritz,* 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). In ordinary criminal proceedings, the defendant must demonstrate that counsel's performance was deficient, and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 698; *Fritz, supra,* 105 *N.J.* at 58, 519 *A.*2d 336. This Court has redefined the second *Strickland* prong in the context of capital sentencing. Recognizing "the profound distinction between our circumscribed appellate-review function and the capital jury's significantly less-restricted role in deciding between life and death," the Court has held that the prejudice prong of the test for ineffective assistance of counsel must be adapted "to the realistic limitations on appellate review of jury penalty-phase deliberations." *State v. Marshall,* 148 *N.J.* 89, 250, 690 *A.*2d 1 (*Marshall III* ), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 140, 139 *L.Ed.*2d 88 (1997). Prejudice is thus established at the penalty phase if "there is a reasonable probability that, but for counsel's unprofessional errors, *the jury's penalty-phase deliberations would have been affected substantially." Id.* at 250, 690 *A.*2d 1 (emphasis added); *see State v. Morton,* 155 *N.J.* 383, 431, 715 *A.*2d 228 (1998). In other words, "if a reasonable juror would have considered the material in his or her deliberative process, then vacation of the death sentence is required." *Morton, supra,* 155 *N.J.* at 481, 715 *A.*2d 228 (Handler, J., dissenting); *Marshall III, supra,* 148 *N.J.* at 310–11, 690 *A.*2d 1 (Handler, J., dissenting).[1]

---

[1] I maintain that deficiency of counsel' performance should be measured by an enhanced standard as well:

> We must recognize that counsel representing a defendant in a capital-murder prosecution must demonstrate the competence of a specialist and expert, not simply the skills of an average practitioner. Most particularly, counsel should exhibit this level of competence in the sentencing phase of a capital murder prosecution.

Insofar as the Court finds that counsel's performance was deficient, I agree. I disagree, however, with the Court's application of the heightened prejudice standard. The Court distorts our well-established standard for determining when a defendant has been prejudiced by the performance of counsel in capital cases. Purporting to apply the enhanced standard, the Court in fact demands evidence of much more, concluding definitively, as if present in the jury room at trial, that none of the alleged deficiencies would have affected—or altered—the conversation regarding whether defendant should live or die. I give juries more credit, and contend that much of the evidence defendant now argues counsel should have presented or helped him to present in his penalty-phase trial would have substantially affected the jury's discussions—particularly defendant's allocution statement.

Reflecting our commitment to heightened standards in capital cases, I conclude that defendant's sentence must be reversed.

## II

Impairment of defendant's right to allocution is the most compelling evidence of counsel's ineffective assistance. Counsel's deficient performance in this regard had the power to seriously diminish the value and content of the jury's sentencing deliberations. The Court's failure to reverse defendant's sentence on this claim compromises our long-held belief that the right of allocution is paramount and may not be diminished.

## A.

The right to make a statement in allocution inheres in this State's common-law. *State v. Loftin*, 146 *N.J.* 295, 362, 680 *A.*2d

---

[*State v. Davis*, 116 *N.J.* 341, 561 *A.*2d 1082 (1989) (Handler, J., dissenting in part and concurring in part).]

*See Marshall III, supra*, 148 *N.J.* at 311, 690 *A.*2d 1 (Handler, J., dissenting); *State v. Savage*, 120 *N.J.* 594, 644, 577 *A.*2d 455 (1990) (Handler, J., concurring in part and dissenting in part); *State v. Oglesby*, 122 *N.J.* 522, 544–45, 585 *A.*2d 916 (1991) (Handler, J., concurring). Capital defendants require, without a doubt, a different level of representation than non-capital defendants.

677 (1996) (*Loftin I* ); *see State v. Zola*, 112 *N.J.* 384, 429–30, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). Defendant's right to allocution, "like the right to testify, is a personal right that defendants themselves decide whether to exercise." *Ante* at 277, 736 *A.*2d at 492. Further, the trial court must address defendant, not counsel, in determining whether the right to allocution has been knowingly and voluntarily waived, and counsel "should consult with their clients so the clients can make their own informed decisions." *Ibid.* The unique right of allocution, the chance for a defendant to address the jury directly and personally about why his life should be spared, can be the most compelling and crucial protection available to a defendant condemned in a capital prosecution. *See Zola, supra*, 112 *N.J.* at 429–30, 548 *A.*2d 1022. It is a right that grows in importance proportionately to the strength and weight of the evidence of a defendant's guilt and blameworthiness. The opportunity to address the penalty-phase jury when life hangs in the balance is unique and critical, a right both delicate and powerful.

The purpose of an allocution statement is to give the jury a chance to determine whether a defendant is sorry, whether he has suffered because of what he has done, and whether he has hope for the future. The right of allocution provides a "precious opportunity for rebuttal," *Thanos v. State*, 330 *Md.* 77, 622 *A.*2d 727, 733 (1993), and "reflects our commonly-held belief that our civilization should afford every defendant the opportunity to ask for mercy[,]" *State v. DiFrisco*, 137 *N.J.* 434, 478, 645 *A.*2d 734 (1994) (*DiFrisco II* ), *cert. denied*, 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996). "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." *Green v. United States*, 365 *U.S.* 301, 304, 81 *S.Ct.* 653, 655, 5 *L.Ed.*2d 670, 673 (1961) (Frankfurter, J., plurality opinion).

Defendant drafted, at the request of counsel, the following allocution statement:

I know that you may want to hear from me on why my Life should be spared by you. As you know from the Various Doctors that testified in this proceeding I'm not to good at explaining myself vocally. So instead I am writing this letter to you and speak to you on this matter. I do not know if Judge Arnone will allow you to read this or let this be read to you but I'm trusting that he will.

The crime's that have me before you in this matter there is no excuse that I can give and what I write is not to be taken as one, this is only to let you know some of my feeling's.

At the time of this crime, I was 18 yr's old and am now 25 yr's old, and I will live with this pain for the rest of my LIFE knowing this. I cannot tell you why someone was murdered that night nor can anyone else in this court room. I say this because I have not been able to answer this question to myself. But over these 7 yr's I have thought about why a murder took place that night and even tho I have not still understood it, I do know that I could not and would not ever intentionally take someone's life away for any reason. That I know for sure.

People say that I don't show any emotion's but that is not true. When I think about what happened I do cry and ask forgiveness from the Alston and Peniston Families when I am in my cell at night or think about what happened. But how can I ask them for forgiveness or let them know that when I cry at night I cry for them also. I have told them that I am sorry and meant it, when I say these thing's to them tho, someone say's that I don't mean it or when I don't say anything they say that I don't have any remorse but the people who make these statements have not sat down with me to see what I am feeling. Before this crime took place, I had not cried for a long time, but now in these 7 yr's I have cried a lot, and within myself I know that my sorrow is knowing that what happened was wrong and for the Peniston Family, and to say to them again I am sorry.

Ladies and Gentleman Thank You for this chance to speak to You.

Defendant was never given the opportunity to deliver his statement to the jury.

## B.

The Court correctly holds that counsel's failure to fulfill her responsibility to fully inform defendant of his right to allocution, and failure to discuss with defendant the pros and cons of exercising the right as well as the particular purpose and limits of an allocution statement, was deficient. *See ante* at 278, 736 *A.*2d at 493. The Court's conclusion that defendant was not prejudiced as a result, however, is founded on several crucial analytical errors.

As an initial matter, it is worth noting that the Court vacillates between holding that defendant's allocution would not have "sub-

stantially affected" and would not have "substantially altered" the jury deliberations. *Compare ibid.* (holding that "a statement of remorse by defendant would not have substantially affected the jury's deliberations") *with id.* at 279, 736 A.2d at 494 (holding that "the record demonstrates that the plea would not have had a substantial propensity to alter the jury's deliberations"). As a matter of clarification, those are not identical statements, and the former, not the latter, is the operative legal standard. To demonstrate prejudice, defendant must simply show that there is a reasonable probability that the jury's deliberations would have been substantially affected. *See Morton, supra,* 155 *N.J.* at 431, 715 A.2d 228; *Marshall III, supra,* 148 *N.J.* at 250, 690 A.2d 1. "Propensity to alter" jury deliberations, *see ante* at 279, 736 A.2d at 494, is not, precisely, the issue.

The Court's analysis contravenes ineffective assistance of counsel principles in many respects. The Court reaches its conclusion by comparing defendant's written allocution statement to the allocution statement that defendant read to the jury in his original 1984 trial, at which he was sentenced to death. The Court reasons that if a jury sentenced defendant to death in 1984, despite defendant's personal plea, then a similar statement in this trial would similarly have had no effect. *See id.* at 280–81, 736 A.2d at 494–95. The fact that a previous jury, presented with a different allocution statement by the same defendant, sentenced defendant to death is irrelevant. The proper question is whether a reasonable jury is likely to have discussed and considered defendant's allocution in its deliberations. Any conscientious juror, in my mind, would certainly have done so. *See infra* at 305–10, 736 A.2d at 509–11.

That error is compounded by the fact that the Court relies on defense counsel's assessment of the value of the allocution. The Court describes Aifer as "best positioned to determine how defendant's allocution would affect the jury," contending that because defense counsel knew the jury her assessment that defendant's allocution statement would not have made a difference is the best

evidence we have that her deficient performance was not prejudicial. *See ante* at 281, 736 *A.*2d at 495. It is inherently contradictory to assess the adequacy of counsel's performance according to counsel's own description of that performance. The Court's attempt to buttress Aifer's assessment of the jury with co-counsel McCauley's evaluation is even more attenuated. The Court notes that "at the time of trial [McCauley] dismissed the effectiveness of an allocution, even without having read the statement." *Id.* at 281, 736 *A.*2d at 495. Again, that only serves to reveal co-counsel's deficient performance—not only did McCauley fail to consult with defendant about the right of allocution, he decided not to read defendant's proposed statement before assessing its impact. In any case, to rely primarily on the counsel whose performance we are reviewing to assess the effect of the deficient performance warps the analysis.

The Court finds that the testimony from experts who described defendant's remorse as he spoke with them would likely have accomplished the same goal as an allocution statement by defendant. Indeed, the Court goes so far as to note that in this case "defendant's remorse, as related by the expert witnesses, may have been more effective." *Id.* at 282, 736 *A.*2d at 496. The Court offers no evidence to support that contention. The conclusion seems, rather, to be based on the notion that witnesses with credentials who testify eloquently are likely to carry more weight with a jury than potentially inarticulate defendants. In fact, the opposite may be true in this context. Although experts may lend credibility to issues at trial regarding technical matters by applying their expertise to reach professional diagnoses and conclusions, an expert's testimony that a defendant is sorry for what he did or that he displays remorse cannot possibly carry with it the same force as a defendant's own expression of that regret. The inarticulateness of a defendant may serve to confirm mitigating evidence of immaturity or diminished capacity. In the same regard, the Court's contention that Aifer's statement to the jury served the same purpose as an allocution statement is plainly wrong. Aifer told the jury: "[O]f course [defendant] feels guilty

about [the murder]. He is guilty of it . . . This is not someone who as I may have said on my opening glorified in his killing or enjoyed the shedding of blood or is proud of his work or feels that he was justified or anything like that." *Ibid.* Apart from the fact that Aifer's comments are unapologetic and fail to convey contrition, they cannot compare with the remorse expressed by defendant's written statement, even as composed without the guidance of counsel.

Further, the Court's attempt to deconstruct defendant's allocution statement, which was unilaterally rejected by Aifer after she "glanced" at it, as a means of determining whether the allocution would have made a difference to the jury that heard defendant's case, is unfair. That statement was written without advice of counsel, a deficiency that the Court acknowledges is responsible for the "problematic" portions of defendant's statement. *See id.* at 279–80, 736 *A.*2d at 494. Only with advice from counsel can a defendant fully understand what an allocution statement is meant to accomplish, how to most effectively convey feelings of remorse, and prevent rebuttal. *See Savage, supra,* 120 *N.J.* at 630–31, 577 *A.*2d 455. The Court must assess whether a reasonable juror's deliberations would have been affected by a statement constructed by defendant with the benefit of counsel's advice, and *not* simply by a written statement defendant wrote without advice from counsel.

Finally, the issue of "whether defendant would have delivered the allocution, even if properly advised," which the Court discounts as "pure speculation," *see ante* at 282, 736 *A.*2d at 496, is irrelevant to the analysis. We need not decide if defendant would have exercised his right to allocution—he has a right to be advised of it. If we determine that had he chosen to exercise the right, a jury's deliberations would have been substantially affected, we must find counsel's performance ineffective. Speculation about whether defendant would have exercised his right is especially pointless in light of the fact that defendant was never informed of

the potential advantages and disadvantages of allocuting in this retrial.

Even if an assessment of the likelihood that defendant would have exercised his right to allocution were relevant, the Court's finding that he likely would not have exercised the right is not supported by the record. The Court contends that defendant's failure to object when Aifer told the trial court that defendant would not offer a statement of allocution, and the fact that defendant testified in his PCR proceeding that he " 'wasn't hoping anything' in particular would happen with the statement," indicates that defendant most likely would not have exercised his right to allocution. *See id.* at 283, 736 *A.*2d at 496. That assessment, however, is made against the backdrop of counsel's failure to advise defendant about the allocution right. With proper advice from counsel, defendant's sentiment regarding his written statement may well have been different. He may have decided to make sure the jury heard it from him. After all, defendant took the trouble to write out a statement, which included the words: "I do not know if Judge Arnone will allow you to read this or let this be read to you but I'm trusting that he will." Defendant claims that he would have chosen to allocute—indeed, he did in his 1984 trial after he was properly informed of and counseled regarding his right to do so. Defendant clearly wanted the statement presented to the jury in one form or another, and it was not.

### C.

Contrary to the Court, I regard defendant's allocution statement, *see supra* at 301, 736 *A.*2d at 506–07, as a powerful expression of defendant's feelings of remorse that would have substantially affected jury deliberations.

We base our deferential standard of review of lower court decisions regarding the impartiality of jurors on the theory that "this [C]ourt is 'perhaps too far removed' from the realities of the *voir dire* to appreciate the nuances concealed by a 'bloodless record....' " *State v. Marshall,* 123 *N.J.* 1, 87, 586 *A.*2d 85 (1991)

(*Marshall I* ), *cert. denied,* 507 *U.S.* 929, 113 *S.Ct.* 1306, 122 *L.Ed.*2d 694 (1993). That contention is based on the notion that only a trial court can adequately interpret the sincerity of jurors' responses to questions. By the same token, we must not assume that a statement from an expert or from defense counsel attesting to a defendant's remorse could possibly have the same impact on the jury as a statement from the defendant. When the defendant speaks, it gives jurors the opportunity to assess the defendant's sincerity and level of remorse, and forces the jurors to look closely at the person whose fate they are being asked to decide. When a defendant has not testified, as here, the need for this assessment becomes all the more important. Given the powerful effect defendant's remorse seems to have had on the two testifying experts, *see ante* at 281–83, 736 *A.*2d at 495–96, we can assume defendant's allocution might have had the same powerful effect on the jury. To speculate otherwise goes against what little evidence we have.

Because of its emotional forcefulness, and perhaps because the community cries out for some indication from the criminal that he understands and regrets what he has done, a defendant's allocution statement has a unique capacity to move a jury. *See* Theodore Eisenberg, Stephen P. Garvey, & Martin T. Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing,* 83 *Cornell L.Rev.* 1599, 1619 (1998) ("[J]urors are more likely to think a defendant is remorseful if he speaks on his behalf than if he says nothing."). "[I]f jurors do think the defendant is remorseful, they are more apt to sentence him to life imprisonment than to death." *Id.* at 1633. Further, "black-defendant status correlates with stronger findings of remorse than white-defendant status." *Id.* at 1626–27. The importance of Bey's right to allocution thus becomes all the more pressing if race truly impacts the extent to which a jury might be moved by his statement. *See, e.g., infra* at 308–09 n. 2, 736 *A.*2d at 510–11 n. 2 (indicating that in highly aggravated capital cases allocutions of black defendants influenced imposition of life sentence).

The importance of allocution, as recognized by this Court, also comes into sharp relief when analyzed in the context of the Court's finding that victim-impact statements may be submitted to a jury in the penalty-phase proceeding. *See State v. Muhammad,* 145 *N.J.* 23, 678 *A.*2d 164 (1996) (holding victim-impact statute, *N.J.S.A.* 2C:11–3c(6), constitutional under federal and State constitutions). In *Muhammad, supra,* the Court held that victim-impact statements were admissible in accordance with the Legislature's desire "to increase the participation of crime victims in the criminal justice system." *Id.* at 33, 678 *A.*2d 164. In doing so, the Court recognized that "the prosecution has a legitimate interest in using victim impact evidence to show each 'victim's uniqueness as an individual human being.'" *Id.* at 38, 678 *A.*2d 164 (quoting *Payne v. Tennessee,* 501 *U.S.* 808, 823, 111 *S.Ct.* 2597, 2607, 115 *L.Ed.*2d 720, 734 (1991)). The Court referred to *Payne, supra,* in which the Supreme Court held that refusing to allow the victim to relay the impact of the murder "deprive[s] the State of the full moral force of its evidence and may prevent the jury from having before it all the information necessary to determine the proper punishment for a first-degree murder." 501 *U.S.* at 825, 111 *S.Ct.* at 2608, 115 *L.Ed.*2d at 735. Victim-impact evidence is used to add "moral force" to the evidence against the defendant, although it provides no actual measure of the defendant's guilt or blameworthiness. *See Muhammad, supra,* 145 *N.J.* at 86, 678 *A.*2d 164 (Handler, J., dissenting) ("Not only does victim-impact evidence have little or no relevance to the defendant's blameworthiness, victim-impact evidence turns the focus from the defendant's blameworthiness to the victim's worthiness."); *id.* at 65, 678 *A.*2d 164 (O'Hern, J., dissenting) ("Does an abused childhood become less so because the child become man has killed a Nobel Prize Winner? Or, put the other way, would an abused childhood be any more of a mitigating factor because the defendant had killed a prostitute or a homeless vagrant? The illogic of the proposition is obvious."). Victim-impact evidence is permitted "to remind the jury that the defendant did not kill an abstract victim, but a real,

unique human being whose loss is felt by the victim's survivors." *Id.* at 40, 678 *A.*2d 164.

The Court in *Muhammad* found a strong parallel between victim-impact evidence and a defendant's allocution statement, and justified its acceptance of victim-impact evidence as admissible evidence on that ground. *See id.* at 45–46, 678 *A.*2d 164 ("[J]ustice, though due to the accused, is due to the accuser also.... We are to keep the balance true.") (quoting *Snyder v. Massachusetts*, 291 *U.S.* 97, 122, 54 *S.Ct.* 330, 338, 78 *L.Ed.* 674, 687 (1934)). That confirms and highlights the true nature and purpose, and underscores the necessity, of the allocution right. If victim-impact evidence has "moral force," so does a defendant's allocution. If a victim's testimony regarding the impact of a defendant's crime is allowed in the defendant's penalty-phrase trial, during which the jury seeks only to determine whether defendant deserves to die based on his moral blameworthiness, then surely the right of a defendant through allocution to communicate and personalize his own sense of blameworthiness is all the more indispensable. Although the defendant has the opportunity to demonstrate his lack of moral blameworthiness through mitigation evidence in the penalty trial, we cannot convincingly contend that without a sincere self-expression from a defendant that the jury is likely to believe second-hand characterizations of defendant's remorse. The accused is entitled to dispel whatever preconceived biases the jury may have against a "voiceless" defendant. The power of a defendant's appeal can clearly dictate his own fate.[2]

---

[2] Anecdotal evidence supports that conclusion. In several New Jersey murder trials, defendants who read passionate allocution statements to the jury were sentenced to life imprisonment despite the horrific aspects of their crimes. Newspaper reports highlighted the defendants' personal pleas, indicating that such pleas played a central role in the community's assessment of the defendants' blameworthiness.

For example, at the trial of Steven Beverly, a prison inmate convicted for the capital murder of a prison guard, it was widely reported that

Defendant's draft allocution statement, *see supra* at 301, 736 A.2d at 506 – 07, contained an expression of remorse that jurors could have found sincere. His appeal was eminently important in light of the press accounts of the crime that, as defendant acknowledged in his allocution, *see ibid.*, dehumanized him. "The entire system of capital punishment depends on the belief that a jury representing the conscience of the community will responsibly exercise its guided discretion in deciding who shall live and who shall die." *Ramseur, supra,* 106 *N.J.* at 311, 524 A.2d 188.

The question for us is not what the Constitution commands, but what our civilization commends. Under our system of capital punishment, a jury of men and women forms the essential link between society and the defendant before the Court. Each capital jury expresses the collective voice of society in making the

---

Beverly did not testify ... but read an allocution—a prepared statement not subject to cross-examination. He was only allowed to express remorse or regret.

"I did not want or mean for Officer Baker to die, God knows," Beverly said choking back tears. "That will be with me for the rest of my life. Now I ask the members of the jury, please have mercy upon my soul." [*Jury Mulls Fate of Jail Guard's Murderer, Trenton Times,* Nov. 11, 1998, at A6.]

Another story noted that "Beverly, 39, of Atlantic City tearfully apologized in court Tuesday and pleaded with the jury, saying he never intended to kill Baker. He asked jurors to 'have mercy upon my soul.'" *Inmate Gets life for Killing Guard, Star Ledger,* Nov. 13, 1998, at 40. Beverly was sentenced to life imprisonment.

In another capital murder prosecution, involving the carjacking, abduction, rape, and stabbing murder of a young mother in front of her child, defendant Scott Johnson, publicly reviled throughout the State, also exercised his right of allocution. He addressed the jury:

I'm sorry for what I did. And I know if I could change back the clock of time I would but I know I can't. I will live with this for the rest of my life. I'm really sorry for what happened. Thank you.

Numerous newspaper articles reported the defendant's plea, and remarked on the personal appeal made to the jury by defendant's six-year-old daughter, who asked the jury to spare her father's life. Articles allotted more space to the allocution statement than to extensive testimonial mitigating evidence regarding the defendant's abusive childhood offered in the defendant's penalty trial. *See, e.g.,* Jim O'Neill, *Shollar Killer Apologies and Pleads for His Life, Star Ledger,* Mar. 3, 1995. The allocution, "[Johnson's] first public acknowledgment of wrongdoing since his arrest," *ibid.,* seems to have been a substantial reason for his life sentence.

individualized determination that a defendant shall live or die. Whatever the
Constitution permits, it bespeaks our common humanity that a defendant not be
sentenced to death by a jury, "which never heard the sound of his voice."
[*Zola, supra,* 112 *N.J.* at 429–30, 548 *A.*2d 1022 (quoting *McGautha v. Califor-
nia,* 402 *U.S.* 183, 220, 91 *S.Ct.* 1454, 1474, 28 *L.Ed.*2d 711, 733 (1971), *vacated on
other grounds,* 408 *U.S.* 941, 92 *S.Ct.* 2873, 33 *L.Ed.*2d 765 (1972)).]

Consistent with that notion, I conclude that there is more than a
reasonable probability that Aifer's deficiency in respect of discuss-
ing with defendant his right of allocution substantially affected the
jury's penalty-phase deliberations in this case. The Court should,
therefore, vacate defendant's death sentence.

### III

Defendant claims that Aifer was ineffective because she unilat-
erally usurped his right to testify. The PCR court rejected this
claim, reasoning that because defendant became familiar with the
right to testify during his prior murder trials in 1983 and 1984, he
was, therefore, aware of the right to testify in his retrial. Accord-
ing to the court, the fact that defendant did not express an
"affirmative, positive interest in testifying," in light of his prior
understanding, confirmed that he waived the right.

This Court correctly perceives that counsel's failure to "inform
defendant properly that the decision whether to testify was his
[and] sufficiently consult with defendant" was deficient. *See ante*
at 271, 736 *A.*2d at 489. The Court's conclusion that "[defen-
dant's] testimony would not have altered substantially the penalty
phase deliberations," *id.* at 272, 736 *A.*2d at 489, however, is
deeply misguided. That conclusion is founded on the same misap-
plication of our ineffectiveness of counsel standard in capital cases
that plagues the Court's analysis of defendant's right to allocution.

### A.

A criminal defendant has a constitutional right to testify on his
own behalf. *Rock v. Arkansas,* 483 *U.S.* 44, 51–53, 107 *S.Ct.* 2704,
2708–10, 97 *L.Ed.*2d 37, 46–47 (1987); *State v. Savage,* 120 *N.J.*
594, 626–28, 577 *A.*2d 455 (1990). That right is " 'essential to due-

process of law in a fair adversarial process.'" *See Savage, supra,* 120 *N.J.* at 626, 577 *A.*2d 455 (quoting *Rock, supra,* 483 *U.S.* at 51, 107 *S.Ct.* at 2709, 97 *L.Ed.*2d at 46 (citation omitted)). "[T]he right to testify is a fundamental right that can be waived only by an 'intentional relinquishment or abandonment....'" *State v. Buonadonna,* 122 *N.J.* 22, 36, 583 *A.*2d 747 (1991) (quoting *Johnson v. Zerbst,* 304 *U.S.* 458, 464, 58 *S.Ct.* 1019, 1023, 82 *L.Ed.* 1461, 1466 (1938)). Defendant is ultimately responsible for exercising that right. *See ibid.; Savage, supra,* 120 *N.J.* at 631, 577 *A.*2d 455; *State v. Bogus,* 223 *N.J.Super.* 409, 423, 538 *A.*2d 1278 (App.Div.1988). The right of a defendant to testify is so important in the context of a criminal trial that it imposes a singular duty on defense counsel to render assistance that will effectively enable the defendant to understand that right and whether to exercise it. *See Savage, supra,* 120 *N.J.* at 630–31, 577 *A.*2d 455.

In order for counsel's assistance to be considered effective, defendant must be given the tools he needs to assess his testimonial right in the context of the *specific trial* in which the right is being contemplated. Because "'[i]t is the responsibility of a defendant's counsel ... to advise defendant on whether to testify and to explain the tactical advantages or disadvantages of doing so or not doing so[,]'" *Savage, supra,* 120 *N.J.* at 630, 577 *A.*2d 455 (quoting *Bogus, supra,* 223 *N.J.Super.* at 423, 538 *A.*2d 1278), a defendant's complete understanding of his right to testify can be confirmed only when we have assurances that he has been advised of the particular consequences in the trial at hand. Trials undoubtedly play out in different ways, even those involving the same crime and the same witnesses. The jury composition changes, the witness's answers to questions may change, the lawyers' strategies are undoubtedly adjusted, the evidence presented might be slightly different. Indeed, Aifer acknowledged the extent to which her own calculations rely, from case to case, on an individual assessment of the context and, most specifically, of the jury and its reactions along the way. *See ante* at 281–82, 736 *A.*2d at 495–96.

The record demonstrates that counsel did not help defendant to understand the nature of his right to testify. Defense counsel's failure to inform defendant of his right to testify must be deemed deficient performance. *Accord id.* at 272, 736 *A*.2d at 489.

The Court's assessment of prejudice relies solely on evidence that defendant's right to testify had been exercised to little avail in *previous* trials. In addition, the Court should be concerned with whether there exists a reasonable probability that the jury's deliberations would have been substantially affected, not with whether the outcome of those deliberations would have been substantially altered by defendant's testimony. *Cf. ante* at 273–74, 736 *A*.2d at 490.

A defendant's testimony is perhaps the most important piece of evidence a jury might consider. A sentence founded on a jury's deliberations that did not explore the testimony of the defendant himself, if he decided to exercise his right to present such testimony, would surely yield an empty sentence. The prejudice to defendant from counsel's deficient performance is plain.

In sum, counsel "did not properly inform" or "sufficiently consult with defendant," *id.* at 271, 736 *A*.2d at 489, and unilaterally made the decision whether or not defendant would testify without his consent. Had defendant testified, his testimony would have substantially affected the jury's deliberations. Therefore, counsel was ineffective in this regard. The Court's failure to recognize this trouncing of one of defendant's most fundamental constitutional rights is unjust.

### B.

In the context of a capital prosecution, the right to testify is similar to the right of allocution. Both allow the accused to appeal to the jury and to lend a personal and potentially forceful voice to his defense. The denial of these important rights in the present case demonstrates the necessity of heightened procedural protections to ensure that capital defendants voluntarily and knowingly waive their rights to allocute and testify. In much the same way

that we require greater assurance when a capital defendant is accepting a plea agreement, a heightened standard is required here because of the extreme nature of the punishment sought by the State. *See State v. Davis*, 116 *N.J.* 341, 374, 561 *A.*2d 1082 (1989) (reversing death sentence and guilty plea where defendant was inadequately informed regarding his eligibility for death penalty); *id.* at 383–90, 561 *A.*2d 1082 (Handler, J., dissenting in part and concurring in part) (explaining necessity of heightened standard for accepting guilty pleas to capital murder).

Trial judges should be required to obtain an on-the-record waiver of the right to allocute and to testify from capital defendants, not counsel. The inquiry ought to include questions regarding whether the defendant's counsel explained to defendant the meaning of the rights as well as the benefits and drawbacks of deciding to waive them. Finally, the court must simply ask the defendant if he has decided not to allocute and/or testify and if he has done so voluntarily.[3] Had these procedures been followed in this case, defendant might not be before us today.

## IV

Defendant also claims that counsel was ineffective at the penalty trial because she failed to present several witnesses who could

---

[3] I acknowledge the Court's concern, expressed in *Savage, supra,* that

> to require the trial court to follow a special procedure, explicitly telling defendant about, and securing an explicit waiver of, a privilege to testify ... could inappropriately influence the defendant to waive his constitutional right *not* to testify....
>
> [120 *N.J.* at 630, 577 *A.*2d 455 (quoting *Siciliano v. Vose,* 834 *F.*2d 29, 30 (1st. Cir.1987)).]

I agree that the trial court should not in any way take on an advisory role in obtaining a waiver directly from a capital defendant, which would contravene the decision in *Savage.* Trial courts are certainly able to ask a defendant objective questions in order to secure assurances that the defendant has voluntarily and knowingly waived his right to testify or allocute. We allow such questioning in plea proceedings and when a defendant is waiving the right to counsel. We should also do so when a capital defendant has decided not to personally appeal to the jury.

have attested to defendant's abusive upbringing, as well as his penchant for substance abuse and the fact that he was intoxicated on the night of the murder. Most compelling of the alleged omissions are counsel's failure to interview several key witnesses, and her decision to meet for only one hour with defendant's mother, Patricia Bey, the person who was perhaps most important to defendant's mitigation case. The Court concludes that counsel was not ineffective and defendant was not prejudiced by these shortcomings. *See ante* at 252–69, 736 *A.*2d at 479–88. I disagree.

### A.

"The failure to investigate, assemble, and present mitigating evidence is the most basic form of ineffectiveness of capital counsel." *Marshall III, supra,* 148 *N.J.* at 322, 690 *A.*2d 1 (Handler, J., dissenting). Counsel cannot be found deficient for making a reasonable strategic decision, even if the tactic was ultimately unsuccessful: "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland, supra,* 466 *U.S.* at 690–91, 104 *S.Ct.* at 2065–66, 80 *L.Ed.*2d at 695; *see Savage, supra,* 120 *N.J.* at 617, 577 *A.*2d 455. Nevertheless, "an inadequate investigation of law or fact robs a strategic choice of any presumption of competence." *Davis, supra,* 116 *N.J.* at 357, 561 *A.*2d 1082. At least, "counsel has a duty to make 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Savage, supra,* 120 *N.J.* at 618, 577 *A.*2d 455 (quoting *Strickland, supra,* 466 *U.S.* at 691, 104 *S.Ct.* at 2066, 80 *L.Ed.*2d at 695).

Defense counsel failed to conduct a timely and adequate investigation of witnesses and evidence necessary to establish a mitigation defense. Investigating a defendant's background in preparation for the presentation of mitigating evidence is a gargantuan task. Aifer did not begin her factual investigation in this case until June 1990, almost two years after she was assigned the case

and two months before the commencement of defendant's retrial. Simply put, two months of investigation is insufficient. Aifer was able to interview only seven potential lay witnesses in person. She evaluated the demeanor of three potential witnesses, including Ri El, pursuant to phone conversations. She failed to interview several potential witnesses regarding Patricia Bey's alcoholism, abuse, and neglect—Mac El, Kim Oilstone, James Sullivan Evans, Theopolis Stewart, and Armand Veltre. And she interviewed six other witnesses whom she chose not to call at trial. Due to Aifer's delayed investigation, this Court cannot endow her decisions to forgo calling witnesses whom she had not interviewed and her cursory approach to interviewing those whom she did call to testify with any presumption of competence. The Court correctly finds that counsel's performance was deficient with regard to trial preparation and the presentation of witnesses. *See ante* at 254 – 55, 736 *A*.2d at 480.

## B.

The Court concludes, however, that the numerous investigatory deficiencies that characterized Aifer's preparation of defendant's mitigation defense can not be said to have prejudiced defendant in such a way as to require that defendant's sentence be vacated. *See id.* at 255, 736 *A*.2d at 480. Although much of the evidence presented by witnesses at defendant's PCR hearing added little to the overall picture of the abuse defendant suffered at the hands of his mother, many of the witnesses presented by defendant at the PCR hearing offered important, noncumulative evidence that had not been presented at the retrial. The testimony of Carl McGloun, Ri El, Mac El, and Bernadine Phillips Jackson regarding Patricia Bey would have focused on defendant's drunkenness, belligerence, abuse and neglect. Theopolis Stewart and Armand Veltre could have testified to defendant's inappropriate dress and lack of personal hygiene. Cora Patterson, Kim Oilstone, and James Sullivan Evans could have testified to defendant's father's neglect of defendant. Macko McGloun's proffered testimony re-

garding his own violent behavior and failure to care for defendant would have been strong corroboration of evidence presented at the retrial. Such testimony cannot be dismissed as simply cumulative or duplicative—it would have strengthened and added to the quantum of evidence adduced at the 1990 retrial. Aifer's failure even to interview many of these witnesses undermines the argument that the choice not to call them was strategic.

I further question the Court's conclusion with regard to Patricia Bey's testimony. The Court asserts that defendant was not prejudiced by Aifer's failure to prepare more extensively with Ms. Bey. *See id.* at 261, 736 *A.*2d at 483 ("Even if Ms. Bey testified more fully at the penalty-phase trial, her testimony would not have affected the jury's deliberations. The additional testimony was largely cumulative of evidence revealed by other penalty-phase witnesses."). That conclusion is questionable, largely for the same reason that deprivation of defendant's right to testify and to allocute is problematic—that is, a personal appeal from the person who committed the wrong is testimony unlike any other that might be offered to convey the same information. *See supra* at 252–53, 736 *A.*2d at 479–80 (stating that doctors' testimony and counsel's comments that defendant was remorseful were insufficient substitutes for defendant's own plea for mercy). Patricia Bey's testimony was significantly diminished by counsel's failure to meet with her more often before trial. The fact that social worker Lois Nardone, who met with Ms. Bey more than ten times over a year's time, was able to coax Ms. Bey into revealing much regarding defendant's abuse suggests that Aifer not only should have put more time into preparing Ms. Bey as a witness, but that she likely would have been successful in doing so. The amount of damning information that Ms. Bey related at the PCR hearing painted a bleak and contoured picture of defendant's upbringing that was seemingly unmatched by any of the other witnesses and would have had a powerful impact on any jury. The fact that Ms. Bey was the only witness who was directly implicated by her rendition of defendant's early life makes her account of the abuse

uniquely reliable and poignant in light of the embarrassment and self-condemnation engendered by her admissions.

I also disagree with the Court's holding that Aifer's limited presentation of evidence of defendant's drug and alcohol abuse "would not have altered substantially the penalty-phase deliberations." *See ante* at 259–60, 736 *A*.2d at 483. At the 1990 retrial, defense experts testified about defendant's longstanding abuse of alcohol and drugs. In addition, Patricia Bey, Wendolyn El, and Clarence Horton testified that defendant had abused alcohol since he was approximately ten years old. Bey and El recalled that defendant had been found unconscious, due to a drug and alcohol overdose, on Route 35. At the PCR evidentiary hearing, defendant produced additional evidence of his drug and alcohol addiction. In the weeks preceding the crimes, Jackson and defendant often got drunk together. At the same time, Stewart observed defendant abuse alcohol and use marijuana and cocaine. Every time Mac El saw defendant in the few months before the murders, defendant was intoxicated. Three years earlier, Evans and Kim Oilstone recalled that defendant was intoxicated on a daily basis. Kenneth McGloun suspected that defendant was drinking. Three defense experts further testified that defendant's drug and alcohol abuse prevented him from controlling his violent impulses. In addition, evidence of substance abuse was introduced through the testimony of defense expert Young.

Aifer's failure to call Stewart, Evans, Mac El, and Kim Oilstone, whom she had not interviewed, as witnesses was not merely deficient representation—it was prejudicial because the testimony of these four witnesses would have augmented the evidence of defendant's alcoholism that was presented at trial. Although the expert witnesses informed the jury that defendant had abused alcohol and drugs throughout his adolescence, testimony from witnesses who actually observed defendant's alcohol or drug use or intoxication would perhaps have had a greater impact.

The Court also takes the position that Aifer's deficient presentation of defendant's lack of treatment for substance abuse was not

prejudicial. *Id.* at 269–70, 736 *A.*2d at 488. Again, I disagree. Patricia Bey testified at the PCR proceeding that she did not seek help for defendant although she knew he was addicted to drugs and alcohol. Given the direct relevance of this type of evidence to a defendant's blameworthiness, *i.e.*, the level of responsibility that should be attributed to him for his crime, Ms. Bey's testimony would have played an important role in defendant's penalty phase presentation.

The combined impact of these failures by counsel, undoubtedly caused by her attempt to squeeze into two months what any competent capital defense attorney would have taken much more time to complete, had grave potential to prejudice defendant by sapping the strength with which the jurors viewed defendant's mitigating evidence, thereby affecting the nature of their deliberations substantially. This Court rightly provides few barriers to defendant's ability to present mitigating evidence in the penalty trial based on the Court's undeniable understanding that such evidence is relevant to "this most delicate kind of determination." *Davis, supra,* 96 *N.J.* at 622, 477 *A.*2d 308. Our low threshold for admissibility of mitigating evidence derives from our recognition that

> [b]ecause of th[e] fundamental distinction between the death penalty and all other punishments, there is a "corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina,* 428 *U.S.* 280, 305, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976). Further, "it is natural that counsel for the condemned in a capital case should lay hold of every ground which, in their judgment, might tend to the advantage of their client...." *Lambert v. United States [Barrett],* 159 *U.S.* 660, 662, 16 *S.Ct.* 135 [135], 40 *L.Ed.* 296 [297] (1895).
>
> [*Ibid.*]

That belief in the central importance of mitigating evidence to a capital sentencing trial should impel us to reverse defendant's sentence in this case due to counsel's failure to "lay hold of every ground" from which defendant might have benefitted.

## V

At his PCR proceeding, defendant requested an evidentiary hearing to reexplore the possibility of prejudice resulting from the

trial court's failure to assure that the jury fully understood the sentencing alternatives to death. Defendant argued that some of the jurors might have been satisfied to sentence defendant to life had they known he would never be released. The PCR court denied defendant's request. This Court now upholds that denial. *Ante* at 294–95, 736 *A*.2d at 502–03.

I believe defendant's claim is valid and requires post-conviction relief. The problem must be traced back to the trial proceedings. While in deliberations, the jury sent a note to the court asking: "Is Mr. Bey ever eligible for parole in the next seventy years?" *Bey III, supra,* 129 *N.J.* at 599, 610 *A*.2d 814. Before the trial court answered the question, a court officer informed the court that the jury had reached a verdict. *Id.* at 599–600, 610 *A*.2d 814. On direct appeal, this Court recognized that the trial court erred by failing to inform the jurors that if they did not sentence defendant to death he would serve an aggregate life sentence with a seventy-year period of parole ineligibility. *Id.* at 603, 610 *A*.2d 814. Despite the potentially overwhelming impact of that error, the Court held it was harmless. *Id.* at 606, 610 *A*.2d 814. I believe that determination was mistaken. *Accord id.* at 660–61, 610 *A*.2d 814 (Handler, J., dissenting) (concluding that lack of clear instruction from court on when defendant would be eligible for parole was prejudicial error). The PCR court's denial of defendant's request for an evidentiary hearing, and the Court's affirmance on the matter, now join that stream of inequity.

The errors complained of were anything but harmless. *N.J.S.A.* 2C:11–3f provides:

> Prior to the jury's sentencing deliberations, the trial court shall inform the jury of the sentences which may be imposed pursuant to subsection b. of this section on the defendant if defendant is not sentenced to death.

In order to properly conduct the balancing process in which capital sentencing jurors must engage, "penalty-phase jurors ... must be told the sentencing options and understand the consequences of their decision prior to deliberation." *State v. Timmendequas,* 161 *N.J.* 515, 635, 737 *A*.2d 55 (1999) (citing *Bey II, supra,*

112 *N.J.* at 162–65, 548 *A*.2d 887; *State v. Nelson*, 155 *N.J.* 487, 502–03, 715 *A*.2d 281 (1998)).

> To hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence.
>
> [*Ramseur, supra*, 106 *N.J.* at 311, 524 *A*.2d 188.]

"[W]hen the jury is choosing between life and death, it should not be prevented from considering the likelihood that a defendant would spend his remaining life in prison." *Timmendequas, supra*, 161 *N.J.* at 636, 737 *A*.2d 55 (citing *Nelson, supra*, 155 *N.J.* at 505, 715 *A*.2d 281).) "When the trial court is confused about the nature of a jury's request during deliberations, the normal procedure is to 'bring the jury into the courtroom in order to resolve [the] uncertainty.'" *Timmendequas, supra*, 161 *N.J.* at 715, 737 *A*.2d 55) (Handler, J., dissenting) (quoting *State v. Brown*, 275 *N.J.Super.* 329, 646 *A*.2d 440 (App.Div.1994) (other citation omitted)). The trial judge may not assume a jury's meaning. *State v. Graham*, 285 *N.J.Super.* 337, 342, 666 *A*.2d 1372 (App.Div.1995).

The jury's request for clarification from the court suggests that defendant was prejudiced by the court's failure to instruct the jury on defendant's aggregate parole disqualifier. *See Bey III, supra*, 129 *N.J.* at 660, 610 *A*.2d 814 (Handler, J., dissenting). The court compounded the error by failing to question the jury before accepting the jury verdict as to the nature of their confusion with regard to defendant's sentence. The trial court's failure to resolve the ambiguity created by the jury's note, even after the jurors subsequently indicated that they had answered the question, was a serious error given the deficient instruction administered to the jury regarding defendant's parole disqualifier. The Court is unable to offer a definitive answer regarding the source of the jury's confusion on defendant's parole ineligibility. The mere fact that the Court found two plausible readings, and that it was reduced to speculation in attempting to resolve the ambiguity, *see ante* at 293, 736 *A*.2d at 502 (quoting *Bey III, supra*, 129 *N.J.* at 606, 610 *A*.2d 814), reveals the deficiency in the Court's conclusion.

Moreover, even if the Court fortuitously resolved the ambiguity correctly, the jury still would have engaged in the kind of speculation that our decisions on jury instructions have continuously sought to avoid.

Despite our efforts to prevent jurors from improperly inserting into their balancing process the alternatives to death, *see Nelson, supra*, 155 *N.J.* at 505, 715 *A.*2d 281 (holding that juries should be informed of non-capital sentences, but that they should base sentencing decision solely on aggravating and mitigating factors), it is incontrovertible that whether or not a defendant will one day go free often plays a role in capital sentencing decisions. *See* William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 *Tex. L.Rev.* 605 (1999). For example, one juror who deliberated on the capital murder trial of New Jersey defendant Scott Johnson, who was spared the death penalty, *see supra* at 308–09 n. 2, 736 *A.*2d at 510–11 n. 2, told a newspaper afterwards that "most, if not all [of the nine jurors] who favored the death penalty, feared that Johnson would one day be released to walk the streets and prey upon others if he was sentenced to life by possibly getting parole [in thirty years]. While never expecting Johnson to actually be executed, the death sentence would have guaranteed no hope of parole, they said." O'Neill, *supra, Star Ledger*, Mar. 5, 1995.

Whether a defendant will go free in thirty years or sometime within seventy years if he is not sentenced to death may similarly be a potent factor that the jury considers. Insofar as the death sentence in this case may have been based on the jury's fear that defendant would one day be released, the difference between a thirty-year parole disqualifier and a seventy-year parole disqualifier is significant when the defendant is twenty-five years of age. The Court severely minimizes the difference by asserting that, like the mistakenly-proffered thirty-year parole disqualifier, "defendant's [actual] alternative sentence allowed for the possibility, as slight as it may be, of parole." *See ante* at 292, 736 *A.*2d at 502.

The court is grasping by implying that the impact on the jury of the two alternative sentences would have been the same given that the possibility existed that defendant could have been released at age ninety-five to commit another murder. The trial court's misinstruction, followed by the court's acceptance of the jury's verdict without clarification of its question, conjures a likelihood of extreme prejudice to defendant. In light of our concern that juries not be left to speculate on what might happen to a defendant who is not sentenced to death, the very real possibility that the jury in this case was doing just that, renders the Court's holding unsupportable.

What, then, is the remedy? At a minimum defendant's request for an evidentiary hearing should have been granted by the PCR court in an effort to make up for the trial court's failure to clear up any ambiguity in the jury's understanding of its sentencing options. The Court rejects defendant's request to engage in the " 'extraordinary procedure' " of calling back jurors to interrogate them after they have been discharged because "the record does not support a finding of 'good cause' " to permit the procedure. *Id.* at 291, 736 *A.*2d at 501. I am, however, hard-pressed to determine what, in the context of the "extraordinary" sentence imposed upon defendant, would constitute "good cause" if not a jury's possible confusion with regard to the consequences of its verdict.

More fundamentally, defendant may have been irrevocably deprived of the opportunity to have secured a life sentence. The question posed by the jury implied that some jurors may have believed that if defendant could not be paroled in his lifetime, he should not be sentenced to death.

We recognize that any reversible error in a capital case may be said in some sense to have deprived defendant of the opportunity to receive a jury verdict resulting in imprisonment, and that nevertheless the usual and proper remedy for such errors is reversal of the death sentence and retrial of the sentencing proceeding in which the defendant may again face the death penalty.

[*Ramseur, supra,* 106 *N.J.* at 313, 524 *A.*2d 188.]

Here, because we cannot be sure on what basis the jury rendered its verdict, defendant can be said to have lost "the opportunity to receive a jury verdict" other than death. In such a case, we must avail ourselves of all possible remedies to avert grave injustice. If the record on the jury's question at trial cannot be constructed reliably in an evidentiary hearing, our only option is to vacate defendant's death sentence and impose a term of life.

## VI

Because this is a capital prosecution, the Court must apply the standards governing post-conviction relief in a manner that maximizes constitutional protections. Paramount among defendant's circumvented rights was the denial of his right of allocution. The record in my view supports defendant's claim that due to counsel's ineffective assistance he was denied the unique and critical opportunity in his penalty trial to make a personal appeal to the jury for mercy. Similar denial, without an effective waiver, of defendant's right to testify compounded that deprivation. Defendant has also established that he was denied effective assistance of counsel in his effort to present mitigating evidence at his penalty trial. That claim inheres in counsel's inadequate investigation, resulting in the serious omissions of possible mitigating testimony discussed herein. Finally, the jury was not clearly and directly informed by the court that defendant could be made to serve a prison term of no less than seventy-years with no possibility of parole as an alternative to death.

Under the enhanced standards that apply in capital cases, those serious errors constitute ample and compelling grounds to award defendant post-conviction relief. I, therefore, dissent.

Justices O'HERN and STEIN join in Part II of this opinion.

*For affirmance*—Chief Justice PORITZ and Justices POLLOCK, GARIBALDI and COLEMAN—4.

*For reversal*—Justices HANDLER, O'HERN, and STEIN—3.